In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3598

MACH MINING, LLC,

*Petitioner,*

*v.*

SECRETARY OF LABOR, MINE SAFETY
AND HEALTH ADMINISTRATION, ET AL.,

*Respondents.*

Petition for Review of an Order of the
Federal Mine Safety and Health Review Commission
Nos. LAKE 2010-1-R, LAKE 2010-2-R, LAKE 2010-714.

ARGUED APRIL 15, 2013 — DECIDED AUGUST 26, 2013

Before RIPPLE, ROVNER, and WILLIAMS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Mach Mining, LLC ("Mach") operates
the Mach No. 1 Mine (the "Mine"), an underground coal mine,
near Johnston City, Illinois. Mach mines the coal using the
"longwall" method, which involves preparing "panels" of coal
for mining by drilling a series of tunnels to provide for
ventilation, travel routes and access to the working areas of the
mine. Once a panel is ready for mining, the longwall machine

moves along the panel "shearing" the coal from the wall (much like a meat slicer in a deli) and using a conveyor belt to transport the sheared coal out of the mine. The Mine consists of five panels, at least some of which are over three miles long.

As an underground coal mine operator, Mach is subject to a significant number of safety regulations, including the requirement that it adopt a ventilation plan "suitable to the conditions and the mining system of the coal mine and approved by the Secretary" of Labor. 30 U.S.C. § 863(o). A mine operator obtains approval by submitting a written plan to, and usually engaging in discussions with, district managers in the Mine Safety and Health Administration ("MSHA"). Mach's ventilation plan utilizes a "push-pull" system which combines blowing large volumes of fresh air into the mine with an exhaust system that pulls out air containing methane, coal dust and other particles. Mach evaluates the effectiveness of its system by setting up monitoring points throughout the mine, including at the longwall face and at the top of the ventilation shaft. An MSHA district manager approved this ventilation system for Panels 1 and 2, but refused to grant approval when Mach proposed the same system for Panel 3. Over the course of eight months, Mach and MSHA negotiated approval of the plan for Panel 3. The administrative law judge ("ALJ") found that the negotiations "included telephone calls, emails, letters and meetings, at both the district and national level." *Mach Mining, LLC v. Sec'y of Labor*, 32 FMSHRC 149, 151 (2010).

MSHA continued to withhold approval of Mach's ventilation plan for Panel 3, and Mach sought administrative review. Although the mining statutes establish a formal procedure for obtaining administrative and judicial review of a citation for

failure to observe a mandatory mine safety or health standard, there is no explicit statutory process for obtaining review of a district manager's refusal to approve a ventilation plan. Instead, in order to obtain review, mine operators follow a procedure outlined in the MSHA policy manual. Following that procedure,[1] Mach notified MSHA that it intended to operate without an approved ventilation plan for the purpose of obtaining administrative review. MSHA then issued two citations for "technical violations" which Mach appealed to the Federal Mine Safety and Health Review Commission (the "Commission").[2]

At a hearing, an ALJ for the Commission determined that the Secretary had the burden of proving that the district manager was not arbitrary and capricious in refusing to approve Mach's ventilation plan. The ALJ thus refused to consider additional evidence tendered by Mach that had not been presented to the district manager during informal negotiations. Based on the record before her, the ALJ determined that the district manager's refusal to approve the ventilation plan was not arbitrary and capricious.

---

[1]  *Program Policy Manual, Vol. V - Coal Mines*, MSHA, 3-5 (June 28, 2013), http://www.msha.gov/REGS/COMPLIAN/PPM/PDFVersion/PPM%20Vol%20V.pdf.

[2]  The Commission is an independent adjudicative agency created by the Federal Mine Safety and Health Amendments Act of 1977, Pub. L. No. 95-164, 91 Stat. 1290 (1977) (codified as amended at 30 U.S.C. §§ 801-878) (the "1977 Act"). It provides administrative trial and appellate review of legal disputes arising under the Act. *See* 30 U.S.C. §§ 815(d), 823(d). We discuss the Commission's role in more detail *infra* at 12-14.

A divided panel of the Commission affirmed the ALJ's decision.[3] As to the proper standard of review, three commis-

---

[3] The parties discovered and cured a procedural defect while the case was pending before the Commission. Generally, when the Secretary issues a citation, he provides the mine operator with notice of the citation and later separately notifies the mine operator of the amount of the proposed penalty. *See* 30 U.S.C. § 815(a). If a mine operator contests a citation, it must separately contest the penalty if it desires review of the amount of the penalty. *See* 29 C.F.R. §§ 2700.21(a), 2700.26. Despite the thirty-day deadline for contesting a citation, a mine operator has the option to wait to contest the citation until after it receives notice of the proposed penalty because it may challenge the fact of the violation during proceedings on the amount of the penalty. *Id.* § 2700.21(b); *United Mine Workers of America, ex rel. Local 1248, Dist. 2 v. Maple Creek Mining, Inc.*, 29 FMSHRC 583, 594 (2007) (quoting *Sec'y of Labor v. Quinland Coals, Inc.*, 9 FMSHRC 1614, 1620-21 & n.9 (1987)). If a mine operator contests the citation and later pays the proposed penalty, the mine operator is deemed to have admitted the fact of the violation, the payment becomes a final order of the Commission, and the party cannot continue to contest the citation. *Sec'y of Labor v. IO Coal Co.*, 31 FMSHRC 1346, 1354 (2009); *Sec'y of Labor v. Old Ben Coal Co.*, 7 FMSHRC 205, 209 (1985) ("[T]he fact of violation cannot continue to be contested once the penalty proposed for the violation has been paid.").

Here, the Secretary issued the citations on September 29, 2009, and Mach contested them on October 1, 2009. On November 4, 2009, the Secretary notified Mach of the proposed penalty and, unbeknownst to the parties' attorneys, Mach paid the penalty by check on November 30, 2009. The Secretary discovered the payment after the ALJ had issued her decision and while the matter was pending before the Commission itself. The Commission granted the parties' request to hold the appeal in abeyance while Mach requested relief from the final order that resulted from the inadvertent payment. The Commission granted relief from the final order; the Secretary filed a penalty assessment; Mach contested the penalty; the ALJ reissued her order; Mach sought review before the Commission. The

(continued...)

sioners held that the ALJ was correct in considering only whether the district manager's decision was arbitrary and capricious. *Sec'y of Labor v. Mach Mining, LLC*, 34 FMSHRC 1784, 1790 (2012). They relied on language in the Mine Act that suggests that the Secretary has discretion in deciding whether to approve a ventilation plan, *id.* at 1791, and noted that the Commission had applied an arbitrary and capricious standard in reviewing denial of emergency response plans, *id.* at 1792.[4]

Two dissenting commissioners believed that a more plenary review was required. They cited prior Commission decisions in which the ALJ independently had weighed evidence and required the Secretary to show by a preponderance of the evidence that the operator's proposed ventilation plan was unsuitable to the mine and that the Secretary's own plan was suitable. *Id.* at 1811 (citing *Sec'y of Labor v. Peabody Coal Co.*, 18 FMSHRC 686, 690-91 (1996); *Sec'y of Labor v. Peabody Coal Co.*, 15 FMSHRC 381, 388 (1993)). These commissioners argued that the Commission should not change the burden and standard for reviewing ventilation plan disputes without a reasoned explanation. They also suggested that emergency response plans have a different standard of review

---

[3] (...continued)
Commission then consolidated the new appeal with the appeal that was held in abeyance.

[4]  *See* 30 U.S.C. § 876(b)(2)(C); *Sec'y of Labor v. Twentymile Coal Co.*, 30 FMSHRC 736, 749, 777-78 (2008) (applying an arbitrary and capricious standard of review to the Secretary's refusal to approve an emergency response plan required by 30 U.S.C. § 876(b)(2)); *Sec'y of Labor v. Emerald Coal Res., LP*, 29 FMSHRC 956, 965-66 (2007) (same).

because the process for approving such plans is set forth by 30 U.S.C. § 876, which does not apply to ventilation plans. *Id.* at 1812-13.[5]

On the merits, the majority of the Commissioners held that the district manager did not abuse his discretion in refusing to approve the various aspects of Mach's ventilation plan. *Id.* at 1809.[6] Because the dissenting Commissioners believed that the ALJ applied the wrong standard, they did not address the merits other than to note that the ALJ may have reached a different conclusion had she applied the preponderance of the evidence standard. *Id.* at 1813-14.

Mach filed a timely petition for review to this court. It argues that it had a right to a de novo hearing on the merits before the ALJ and that the ALJ should not have applied the arbitrary and capricious standard. It also maintains that the ALJ erred by excluding or discounting certain evidence and

---

[5]  All five commissioners agreed that the ALJ did not abuse her discretion in excluding evidence that had not been presented to the district manager prior to the date of the technical violation. The majority opinion held that the ALJ did not abuse her discretion in excluding evidence related to other mine plans because the district manager must decide what is suitable to Mach's mine, and Mach's unique system makes comparison to other ventilation plans of limited value. *Sec'y of Labor v. Mach Mining, LLC*, 34 FMSHRC 1784, 1807 (2012). The majority also noted that the ALJ did not wholly exclude the evidence on other mine ventilation plans because she had allowed "witnesses to rely upon their experiences with other mines." *Id.* at 1808.

[6]  The majority remanded one issue for further consideration by the ALJ. *Id.* at 1798. On remand, the parties stipulated that the remanded issue was moot, and the Commission denied Mach's petition for further review.

that the ALJ's factual findings are not supported by substantial evidence.

We have jurisdiction under 30 U.S.C. § 816(a)(1). For the reasons set forth in this opinion, we deny the petition.

# I

## DISCUSSION

### A.

As this case comes to us, the major point of contention between the parties is whether the Commission, the authority charged with adjudicating citations issued by the Secretary through MSHA, should review deferentially the Secretary's refusal to approve a ventilation plan. Stated more precisely, or at least more practically, when the Secretary refuses to approve a ventilation plan, is the mine operator entitled to a de novo hearing before the Commission, or must the Commission defer to the Secretary's decision on the record assembled by the district manager and reverse that determination only if the Secretary fails to establish that the decision was not arbitrary and capricious?

In *Steadman v. Securities & Exchange Commission*, 450 U.S. 91, 95 (1981), the Supreme Court noted that, when faced with the task of ascertaining the applicable degree of proof, a court first must ascertain whether Congress has spoken on the issue. If Congress has spoken, that is, of course, the end of the matter. If Congress has not spoken, courts must fashion the applicable standard. In undertaking such a task, however, we must choose a standard compatible with the congressional policies

articulated in the general legislative scheme and choose a standard that best reflects the values and choices that Congress has identified. *See id.* at 97-102 (examining the language and history of section 7(c) of the Administrative Procedure Act ("APA") to determine what standard of proof Congress intended to be applied). We now embark on that analytical journey.

**1.**

Mach submits that the question before us requires a straightforward application of the cardinal rule of statutory interpretation: Courts must adhere to the plain meaning of the statutory language. Noting that the Secretary's refusal comes before the Commission as the adjudication of a citation, albeit a citation for a "technical violation," Mach submits that *every* proceeding to review a citation, including citations for "technical violations," is an adjudicative proceeding that must be conducted in accordance with section 554 of the APA. *See* 30 U.S.C. § 815(d). In Mach's view, those procedures require the exercise of de novo review of the Secretary's judgment. It notes that, in *Steadman*, 450 U.S. at 102, the Supreme Court held that the standard of proof that applies in hearings governed by section 554 of the APA is preponderance of evidence.[7]

---

[7] *Steadman v. Securities & Exchange Commission*, 450 U.S. 91, 102 (1981), specifically held that section 7(c) of the APA established a "traditional preponderance-of-the-evidence standard." Section 7(c) of the APA was codified at 5 U.S.C. § 556(d) and applies to adjudications under section 554. *See* 5 U.S.C. § 556(a).

Mach is correct in stating that our starting point in analyzing the question before us must be the plain wording of the statute enacted by Congress. However, we cannot apply this rule to selected words divorced from the context in which they appear. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000) ("The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" (citation omitted) (quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989)); *Zeigler Coal Co. v. Kleppe*, 536 F.2d 398, 405 (D.C. Cir. 1976) (examining the Federal Coal Mine Health and Safety Act of 1969 "[o]n the whole" to determine whether adopted and approved ventilation plans should be enforced as mandatory standards). Our ultimate objective must be to give effect to the congressional intent embodied in the entire statute. We therefore turn to an examination of the overall text and structure of the statute to ascertain its intent.

Examination of the text and the structure reveals that the regulation of mining industry practices has been committed by Congress to a bifurcated structure. In the simplest of terms, the statutory scheme contemplates that the Secretary sets mandatory health and safety standards, either through the formal agency rulemaking process, 30 U.S.C. § 811, or through plans submitted by industry participants for approval, *id.* § 862(a) (roof plans); *id.* § 863(o) (ventilation plans); *id.* § 875 (emergency shelter plans); *id.* § 876(b)(2)(C) (emergency response plans); *see also Zeigler Coal Co.*, 536 F.2d at 409 (holding that the "requirements of duly adopted ventilation plans generally are

[as] enforceable" as other mandatory standards (footnote omitted)). The Secretary also must enforce rules and standards once they are promulgated or approved. 30 U.S.C. §§ 814-815. By contrast, the Commission performs an adjudicative role, principally the adjudication of citations issued by the Secretary. *Id.* §§ 815(d), 823(d). We now examine each of these roles in more detail.

First, with respect to formal rulemaking, the Mine Act authorizes and directs the Secretary to "develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines." *Id.* § 811(a). The Secretary also is authorized to grant exceptions to mine operators who request a modified standard. *Id.* § 811(c). Before granting an exception, however, the Secretary must determine that the proposed modified standard would be just as safe as the mandatory standards, and must publish notice and provide opportunity for a public hearing on the matter. *Id.*[8] It is well

---

[8]   Section 811(c) provides:

> Upon petition by the operator or the representative of miners, the Secretary may modify the application of any mandatory safety standard to a coal or other mine if the Secretary determines that an alternative method of achieving the result of such standard exists which will at all times guarantee no less than the same measure of protection afforded the miners of such mine by such standard, or that the application of such standard to such mine will result in a diminution of safety to the miners in such mine. Upon receipt of such petition the Secretary shall publish notice thereof and give notice to the operator or the representative of miners in the affected
>
> (continued...)

established that the exercise of such rulemaking authority is subject to deferential review. *See, e.g., Int'l Union, United Mine Workers of America v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 964, 966-67 (D.C. Cir. 1990) (holding that the Secretary was entitled to deference when determining whether to alter mandatory standards, but remanding because the Secretary failed to explain adequately his reasoning).

In certain areas of mine safety, such as roofing and ventilation systems, Congress recognized that miner safety could be addressed effectively only in a mine-specific context. S. Rep. No. 95-181, at 25 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3401, 3425 ("Such individually tailored plans, with a nucleus of commonly accepted practices, are the best method of regulating such complex and potentially multifaceted problems as ventilation, roof control and the like."). The statutory scheme therefore requires that, in these areas, individual

---

[8] (...continued)

mine, as appropriate, and shall cause such investigation to be made as he deems appropriate. Such investigation shall provide an opportunity for a public hearing at the request of such operator or representative or other interested party, to enable the operator or the representative of miners in such mine or other interested party to present information relating to the modification of such standard. Before granting any exception to a mandatory safety standard, the findings of the Secretary or his authorized representative shall be made public and shall be available to the representative of the miners at the affected mine. The Secretary shall issue a decision incorporating his findings of fact therein, and send a copy thereof to the operator or the representative of the miners, as appropriate. Any such hearing shall be of record and shall be subject to section 554 of Title 5.

mine operators develop mine-specific plans, potentially containing additional health and safety requirements, and submit them to the Secretary's delegate for approval before implementation. 30 U.S.C. §§ 862(a) (roof plans), 863(o) (ventilation plans).

Finally, the Secretary has enforcement authority and can issue a citation when he "or his authorized representative believes that an operator of a coal or other mine subject to this chapter has violated this chapter, or any mandatory health or safety standard." *Id.* § 814(a). The Secretary is further authorized to issue an order requiring the mine operator to withdraw persons from the mine if, in any ninety-day period, he finds two violations that were "caused by an unwarrantable failure" to comply with the mandatory standards and which "could significantly and substantially contribute" to a safety or health hazard. *Id.* § 814(d).

In contrast to the Secretary's duties, adjudication of citations was entrusted by Congress to the Commission. An operator may choose not to contest a citation, in which case the citation is deemed a final order of the Commission thirty days after receipt. *Id.* § 815(a). Alternatively, an operator may choose to contest a citation, in which case the operator additionally may request a hearing for temporary relief under § 815(b)(2) prior to full review on the merits. When looking at the merits,

> the Commission shall afford an opportunity for a hearing (in accordance with section 554 of Title 5, but without regard to subsection (a)(3) of such section), and thereafter shall issue an order, based on findings of fact, affirming, modifying, or vacating

> the Secretary's citation, order, or proposed penalty, or directing other appropriate relief.

*Id.* § 815(d).

In bifurcating this regulatory system, Congress clearly intended to separate the Secretary's rulemaking and enforcement functions from the Commission's adjudicative function. The Senate report states that the purpose of vesting adjudicative authority in the Commission was to have a "completely independent adjudicatory authority." S. Rep. No. 95-181 at 47, *reprinted in* 1977 U.S.C.C.A.N. at 3447. "The Committee believes that an independent Commission is essential to provide administrative adjudication which preserves due process and instills much more confidence in the program." *Id.* In examining a statute with a similar structure, the Supreme Court noted that "[t]he purpose of this 'split enforcement' structure was to achieve a greater separation of functions than exists within the traditional 'unitary' agency, which under the Administrative Procedure Act (APA) generally must divide enforcement and adjudication between separate personnel." *Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 151 (1991) (examining the distinct roles of the Secretary of Labor and the Occupational Safety and Health Review Commission ("OSHRC") under the Occupational Safety and Health Act).[9]

---

[9] We agree with the Court of Appeals for the District of Columbia Circuit's view that "[t]he administrative and judicial review procedures in the OSH Act are nearly identical to those in the Mine Act." *Sturm, Ruger & Co. v. Chao*, 300 F.3d 867, 872 (D.C. Cir. 2002) (alteration in original) (internal

(continued...)

Notably, although Congress intended that the Commission review the Secretary's decisions, the Senate report also indicated that the Secretary's interpretation of the statute and regulations should receive some deference: "Since the Secretary of Labor is charged with responsibility for implementing this Act, it is the intention of the Committee, consistent with generally accepted precedent, that the Secretary's interpretations of the law and regulations shall be given weight by both the Commission and the courts." S. Rep. No. 95-181 at 49, *reprinted in* 1977 U.S.C.C.A.N. at 3448; *see also Martin,* 499 U.S. at 152-53 (discussing the Secretary's expertise in assessing a particular regulatory interpretation); *Sec'y of Labor v. Excel Mining, LLC*, 334 F.3d 1, 6, 11-12 (D.C. Cir. 2003) (holding that the Secretary of Labor's interpretation was entitled to deference and that the decision to issue a citation based on an average of samples taken during a single shift, rather than during multiple shifts, was reasonable).

**2.**

This examination of the text and the structure of the statute reveals two important points for the task before us. First, the role of the Secretary in approving safety plans in areas not susceptible to general regulatory governance through the rulemaking process is distinctly different from the role he performs pursuant to his enforcement duties. After a process of dialogue and negotiation with the mine operator, the

---

[9] (...continued)
quotation marks omitted).

Secretary must make an independent judgment that the ventilation system for a particular mining site is safe for those who will work there.[10] Although specific to a certain mine and susceptible to more frequent alteration as conditions in the mine change, the process is essentially one of setting standards, not, in many ways, substantially different from setting more lasting and general standards through the rulemaking process. As the Court of Appeals for the District of Columbia Circuit has noted, the plan approval process differs from formal rulemaking because the mine operator takes the initiative in the development of these mine-specific standards,[11] nevertheless the statute clearly places on the Secretary the duty to reach an independent judgment as to the adequacy of the standards.[12] The statute places on the Secretary's shoulders the obligation and prerogative of making a discretionary judgment as to whether the ventilation system developed by the operator will protect those who must expose their health, and indeed

---

[10]  S. Rep. No. 95-181, at 25 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3401, 3425; *see also United Mine Workers of America, Int'l Union v. Dole*, 870 F.2d 662, 669 n.10 (D.C. Cir. 1989) ("not[ing] that while the mine operator had a role to play in developing plan contents, MSHA always retained final responsibility for deciding what had to be included in the [roof] plan").

[11]  *See Dole*, 870 F.2d at 667-69 (addressing roof control plans); *Zeigler Coal Co. v. Kleppe*, 536 F.2d 398, 403 (D.C. Cir. 1976) (addressing ventilation plans).

[12]  *See* 30 U.S.C. § 862(c) (requiring a roof plan to provide for roof securing materials "at such other locations in the coal mine as the Secretary may prescribe"); *id.* § 863(o) (requiring a ventilation plan to show "such additional or improved equipment as the Secretary may require… and such other information as the Secretary may require").

their lives, to risk by working at that specific site. In contrast to the Secretary's rulemaking responsibilities, the Secretary's decision to issue a citation pursuant to his enforcement authority is subject to review by the Commission. If the mine operator contests the citation, the Commission has authority to examine independently the facts and circumstances and determine whether the mine operator in fact did violate a standard.

Our examination of the language and the structure of the statute yields a second significant point. It reveals a significant gap in the overall statutory scheme: Resolution of an impasse between the mine operator and the Secretary with respect to the adequacy of a ventilation plan is not addressed specifically in the statutory language and is not easily discernible from the overall structure of the statutory scheme. Because this issue is central to our inquiry, we now undertake a historical analysis of the statutory language in the hope that it will shed some light on our understanding of how the statute contemplates the resolution of such an impasse.[13]

Modern efforts to deal legislatively with problems of health and safety in the mining industry find their anchor in the

---

[13]   In determining Congress's intent with respect to the level of judicial review it contemplated, we follow the direction of the Supreme Court in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), and look to "the statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review." *Id.* at 207 (citation omitted); *see also id.* at 216 (noting the Mine Act's structure and legislative history); *Steadman*, 450 U.S. at 97-102 (examining the language and legislative history of the APA to determine the appropriate standard of proof).

Federal Coal Mine Health and Safety Act of 1969, Pub. L. No. 91-173, 83 Stat. 742 (1969) (codified as amended at 30 U.S.C. §§ 801-878) (the "1969 Act"). This legislation established, and provided for the enforcement of, mandatory health and safety standards. The 1969 Act directed the Secretary of the Interior to work with other agencies to develop and promulgate health and safety standards which would be mandatory for all coal mines, *see* 1969 Act § 101, 83 Stat. at 745-46, and set interim standards which would be mandatory until permanent standards were in place, *see id.* §§ 201, 301, 83 Stat. at 760, 765. In setting mandatory standards, the Secretary of the Interior was directed to consult with federal and state agencies, representatives of mines and miners, and other interested persons; to base standards on research; to propose standards using a fairly formal notice and comment procedure and to make factual findings. *Id.* § 101(c)-(g), 83 Stat. at 745-47. Notably, the 1969 Act also required mine operators to create mine-specific plans for areas of particular concern such as ventilation and roofs. *See id.* §§ 302(a), 303(o), 83 Stat. at 766, 772.

The 1969 Act called for mine inspections, *id.* § 103, 83 Stat. at 749-50, and empowered the Secretary of the Interior to enforce the mandatory standards by issuing notices or fines, or by ordering a mine to cease operations, *id.* § 104, 83 Stat. at 750-52.[14] Mine operators could seek review of any order or notice by sending a request to the Secretary of the Interior who

---

[14]   In 1976, the D.C. Circuit held that a mine-specific plan is as enforceable as the mandatory standards once it is adopted by the mine operator and approved by the Secretary of the Interior. *Zeigler Coal Co.*, 536 F.2d at 409.

was then required to investigate and hold a hearing, if requested, to enable the operator "to present information relating to the issuance and continuance of such order." *Id.* § 105(a)(1), 83 Stat. at 753. The hearing would be "of record" and subject to section 554 of the APA, *id.* § 105(a)(2), 83 Stat. at 753; the Secretary of the Interior was required to make findings and issue a written decision, *id.* § 105(b), 83 Stat. at 753. Orders of the Secretary were subject to judicial review by a United States court of appeals, *id.* § 106(a), 83 Stat. at 754, but the court's decision would be based "on the record made before the Secretary," *id.* § 106(b), 83 Stat. at 754. The Secretary's findings would be conclusive "if supported by substantial evidence on the record considered as a whole." *Id.*

As we have noted, the 1969 Act required mine operators to adopt mine-specific ventilation plans approved by the Secretary. *Id.* § 303(o), 83 Stat. at 772. Regulations promulgated immediately after the 1969 Act established general criteria for approving ventilation plans, *see* Mandatory Safety Standards, Underground Coal Mines, 35 Fed. Reg. 17,890, 17,904 (Nov. 20, 1970) (codified at 30 C.F.R. § 75.316-2 (1971)), but neither the 1969 Act nor the regulations outlined a method for a mine operator to obtain review of a district manager's refusal to approve a ventilation plan. The Committee Report attached to the House version of the bill suggested that a mine operator could appeal a citation to the Secretary or directly to the Federal Coal Mine Health and Safety Board of Review.[15] If the

---

[15] The Federal Coal Mine Health and Safety Board of Review was created in 1952 when Congress amended the Federal Coal Mine Safety Act. Law of

(continued...)

operator appealed directly to this board, it was "not bound by any previous findings of fact and the burden of proof [was] on the Secretary." H.R. Rep. No. 91-563 (1969), *reprinted in* 1969 U.S.C.C.A.N. 2503, 2512. If the operator sought review before the Secretary before appealing to the board, the Secretary's decision would be prima facie evidence against the operator, but "either side" was allowed to "produce additional evidence." *Id.* This procedure did not become part of the final version of the 1969 Act. In sum, the first modern effort to address mine safety problems simply did not address resolving an impasse between a mine operator and the Secretary over the contents of a site-specific ventilation plan.

In 1976, the United States Court of Appeals for the District of Columbia Circuit suggested a process for obtaining review of disapproval of a mine ventilation plan. *See Zeigler Coal Co.*, 536 F.2d at 406-07. In that case, the court was asked to consider whether provisions of an approved ventilation plan should be considered mandatory standards and thus subject to the 1969 Act's enforcement provisions. *Id.* at 401. Before answering the question in the affirmative, the court examined the 1969 Act's history and process for obtaining approval of a ventilation plan. The court noted that ventilation plans "appear to be developed by informal negotiations between the operator and

---

[15] (...continued)
July 16, 1952, Pub. L. No. 552, § 205(a), 66 Stat. 692, 697 (1952) (repealed 1969). It was abolished when the 1969 Act became effective. *See* Federal Coal Mine Health and Safety Act of 1969, Pub. L. No. 91-173, § 509, 83 Stat. 742, 803 (1969) (codified as amended at 30 U.S.C. §§ 801-878) (the "1969 Act") (repealing the Federal Coal Mine Safety Act).

the Secretary's representative" without the protections of the formal notice and comment process set forth in section 101 of the 1969 Act. *Id.* at 403. The mine operator argued that if the Secretary could enforce a ventilation plan as a mandatory standard, he would be able to circumvent the formal procedures for setting safety standards by simply refusing to approve an operator's ventilation plan unless the operator agreed to whatever standards the Secretary deemed appropriate. *Id.* at 406. The court rejected this argument; it pointed out that a mine operator could choose whether to adopt a plan and the agency's recourse when an operator refused to adopt a plan would be to seek civil or criminal penalties which would require a hearing and thus act as a safeguard against agency attempts to circumvent formal standard-setting procedures. *Id.* at 406-07.

> The statute makes clear that the ventilation plan is not formulated by the Secretary, but is "adopted by the operator." While the plan must also be approved by the Secretary's representative, who may on that account have some significant leverage in determining its contents, it does not follow that he has anything close to unrestrained power to impose terms. For even where the agency representative is adamant in his insistence that certain conditions be included, the operator retains the option to refuse to adopt the plan in the form required … .

> The agency's recourse to such a refusal to adopt a particular plan appears to be invocation of the civil and criminal penalties of § 109, which require an opportunity for public hearing and, ultimately,

> appeal to the courts. At such a hearing, the operator may offer argument as to why certain terms sought to be included are not proper subjects for coverage in the plan. Because we believe that the statute offers sound basis for narrowly circumscribing the subject matter of ventilation plans, we conclude that this opportunity for review is a substantial safeguard against significant circumvention of the § 101 procedures.

*Id.* (footnotes omitted). The court noted that the Secretary's power was further limited because the ventilation plan must contain only specific, as opposed to general, standards applicable to a particular mine and must not address issues other than ventilation. *Id.* at 407. The Court of Appeals for the District of Columbia Circuit's statement in *Zeigler* is significant because, although it does not address the standard of review, it specifically addresses, for the first time, the question of resolution of an impasse over the terms of a ventilation plan.

The following year, Congress enacted the Federal Mine Safety and Health Amendments Act of 1977, Pub. L. No. 95-164, 91 Stat. 1290 (1977) (codified as amended at 30 U.S.C. §§ 801-878) (the "1977 Act"). The 1977 Act moved responsibility for setting and enforcing health and safety standards from the Secretary of the Interior to the Secretary of Labor, 1977 Act § 102, 91 Stat. at 1290, and created the Mine Safety and Health Administration as an agency within the Department of Labor, *id.* § 302(a), 91 Stat. at 1319. Like the 1969 Act, the 1977 Act provided that the Secretary could issue citations for violations of the mandatory standards, but rather than challenging the citation to the Secretary, a mine operator

now would contest a citation before a newly created Federal Mine Safety and Health Review Commission. *Id.* § 201, 91 Stat. at 1305-06, 1313 (amending sections 105(d), 113(a) of the 1969 Act). As before, the hearing before the Commission would be conducted in accordance with 5 U.S.C. § 554. *Id.* § 201, 91 Stat. at 1306 (amending section 105(d) of the 1969 Act). After a hearing, the Commission would be required to issue an order based on findings of fact. An operator could seek judicial review by a court of appeals, which would decide the case based on the record created by the Commission; however, a party could obtain permission to supplement the record if it could show that additional evidence was "material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Commission." *Id.* § 201, 91 Stat. at 1306 (amending section 106(a)(1) of the 1969 Act). The Senate report explained that the creation of an independent review commission was "essential" to preserving due process and instilling more confidence in the program. S. Rep. No. 95-181 at 47, *reprinted in* 1977 U.S.C.C.A.N. at 3447. It also noted that the initial hearing before the Commission should be before an ALJ, who could compel witnesses and the production of evidence. *Id.* at 48, *reprinted in* 1977 U.S.C.C.A.N. at 3447.

Despite its broad attention to the structure of the mechanism for regulating the mining industry, this legislative effort yielded no concrete guidance on the resolution of impasses over ventilation plans. The 1977 Act simply retained the section of the 1969 Act that required ventilation plans to be suitable to the conditions of the mine. Notably, however, the Senate report approved of *Zeigler*'s discussion about the adoption of a mine plan, emphasized the importance of the

Secretary's judgment in approving plans and noted that the
operator is "entitled to full and prompt judicial review." *Id.* at
25, *reprinted in* 1977 U.S.C.C.A.N. at 3425. The report stated:

> The Committee notes that in addition to
> mandatory standards applicable to all operators,
> operators are also subject to the requirement set out
> in the various mine by mine compliance plans
> required by statute or regulation. The requirements
> of these plans are enforceable as if they were
> mandatory standards. Such individually tailored
> plans, with a nucleus of commonly accepted
> practices, are the best method of regulating such
> complex and potentially multifaceted problems as
> ventilation, roof control and the like. *The Committee
> notes with approval that individual mine plan adoption
> and implementation procedures have been sustained by
> the federal Court of Appeals for the District of Columbia
> circuit ([Zeigler] Coal Company v. Secretary of the
> Interior, 536 F.2d 398, (1976). Thus, the Committee fully
> expects the individual mine plan technique to continue to
> be utilized by the Secretary in appropriate circumstances.
> The Committee cautions that while the operator proposes
> a plan and is entitled, as are the miners and
> representatives of miners to further consultation with the
> Secretary over revisions, the Secretary must
> independently exercise his judgment with respect to the
> content of such plans in connection with his final
> approval of the plan.* The operator and the
> representative of miners are entitled to full and

prompt judicial review of plan contents, under
Section 102(f).[16]

*Id.* (emphasis added).

The House conference report, *see* H.R. Rep. No. 95-655
(1977) (Conf. Rep.), *reprinted in* 1977 U.S.C.C.A.N. 3485, 3501,
discussed the process for review of citations by
the Commission, but did not discuss a procedure for reviewing
the Secretary's refusal to approve a ventilation or other mine
plan. It simply noted that it would adopt the Senate's version
of the bill relating to the review of citations, which gave the
aggrieved party the opportunity to be heard before the
Commission and authorized the Commission to issue a
decision based on its own factual findings. *Id.*

In sum, other than the Senate report's reference to the
method mentioned in *Zeigler*, neither the 1977 Act nor its
accompanying legislative history discusses procedures for
obtaining approval of individual mine plans or obtaining
review of the Secretary's refusal to approve a mine plan. Nor
do they specify the standard of review to be applied by the ALJ
in reviewing the Secretary's decision.

In 2006, Congress gave us another oblique indication that
it approved of the citation system as a means of reviewing the
Secretary's disapproval of plans drawn up by mine operators.
In that year, Congress amended the Mine Act to require mine

---

[16]    The committee report states that judicial review is available under
"Section 102(f)," but this must be a typographical error. Neither the 1969
Act nor the 1977 Act contain a section 102(f). Judicial review under both acts
is available under section 106.

operators to adopt emergency response plans approved by the
Secretary. *See* Mine Improvement and New Emergency
Response Act of 2006, Pub. L. No. 109-236, 120 Stat. 493 (2006)
(codified at 30 U.S.C. §§ 801-878) (the "2006 Act"). The 2006 Act
provides that disputes relating to the Secretary's refusal to
approve an emergency response plan be resolved through a
process substantially similar to the "technical violation"
method used for reviewing mine ventilation plans. *See* 2006
Act § 2, 120 Stat. at 495-96 (amending section § 316(b)(2)(G) of
the 1977 Act). Congress did not amend the provisions related
to ventilation plans, but the Senate report accompanying the
2006 Act discussed the value of the plan adoption regulations
that were already in place for roof and ventilation plans. S.
Rep. No. 109-365, at 4 (2006), *available at*
http://www.msha.gov/SOLICITOR/MinerActLegHist.pdf.[17]
Specifically, the report notes that the plan method is ideal for
ensuring that the safety plan remains up-to-date on the best
technologies and accounts for the changing conditions of a
particular mine. "[F]lexibility and practicality" are important
in formulating a mine plan. *Id.* Further, the report specifically
recognizes that negotiations on an appropriate plan will not

---

[17] The ventilation plan regulations do not set forth a method for obtaining
approval of a ventilation plan or explain how a district manager should
decide to approve a plan. However, there are extensive general ventilation
regulations applicable to every mine which detail the type of fans a mine
may use to ventilate a mine, where the fans and their power sources are to
be located, daily air quality monitoring, where air quality samples should
be taken, minimum air quality standards and more. *See* 30 C.F.R. §§ 75.300-
75.389 (2009). The mine ventilation plan must include information related
to many of these regulations and include "any additional provisions
required by the district manager." *See id.* § 75.371.

always be easy and "that in some instances there may be controversies that require prompt and impartial resolution." *Id.* at 5. The report states the committee's intention to adopt a "technical violation" method of review because that is a method already familiar to the parties:

> As is currently the case with roof and ventilation plans, the dispute resolution process begins with a review and decision by an Administrative Law Judge from the Mine Safety and Health Review Commission. Further appeal from the ALJ's decision may be taken in the same manner as with any other citation. *This process is, of course, to be distinguished from the issuance of a citation for non-compliance with the provisions of an already approved plan. In those instances the normal procedures regarding citation level and appeal process would apply.*

*Id.* (emphasis added).

The report emphatically distinguishes the "technical violation" from the use of citations to enforce already existing rules. Notably, neither the text nor the legislative history of this statute addresses the standard of review to be employed by the Commission in adjudicating denials of approval for emergency response plans.[18]

Implementing regulations and agency directives during the time these legislative actions were taken similarly add nothing

---

[18] We note that the Commission has applied an arbitrary and capricious standard of review to emergency response plan disputes. *See Emerald Coal Res., LP*, 29 FMSHRC at 966.

of substance to our inquiry. On November 20, 1970, the Secretary of the Interior, then the officer responsible for the administration of the statute, issued a final rule establishing standards for ventilation as required by the 1969 Act. The regulation required operators to submit various pieces of information to the MSHA district manager; it also set forth criteria to guide approval of a ventilation plan. Mandatory Safety Standards, Underground Coal Mines, 35 Fed. Reg. at 17,904. The regulations state that the operator must submit a plan to the Secretary, but do not suggest a process for resolving disputes or obtaining review. *Id.*; *see also* 30 C.F.R. § 75.316 (1971). The 1978 and 2009 versions of the rule also suggest no process for resolution of these disputes. *See* 30 C.F.R. § 75.316 (1978), 30 C.F.R. §§ 75.370-75.371 (2009).

In examining MSHA's internal policies, we note that volume V of MSHA's "Program Policy Manual" discusses the process for approving mine plans and contesting MSHA's refusal to approve a plan. According to the manual, if MSHA is unable to approve a plan, "the operator should be notified in writing of what information is needed or why the changes cannot be approved. The process should be completed quickly … ." *Program Policy Manual, Vol. V - Coal Mines*, MSHA, 4 (June 28, 2013), http://www.msha.gov/REGS/COMPLIAN/-PPM/PDFVersion/PPM%20Vol%20V.pdf.[19] The manual indicates that an operator may contest MSHA's decision by notifying MSHA and receiving a citation. "Where the operator

---

[19] The manual available from MSHA's website is current as of June 2013, but the section on mine plan approval contests has not changed since February 2003.

disagrees with MSHA and indicates the desire to seek a citation to contest before the Federal Mine Safety and Health Review Commission, a citation should be issued." *Id.* The manual suggests ways of obtaining the necessary citation and explains that review will be before an ALJ:

> [In t]he case of a new mine plan with a provision that cannot be approved … [t]he operator could indicate that mining operations will begin on a particular date, using the plan that contains the provision which is not approved. On the date indicated for starting operations, a citation would be issued for failure to adopt and follow an approved plan, as required by the applicable standard. Abatement would be achieved by the operator promptly adopting provisions that satisfy MSHA's previously documented concerns.

*Id.* at 5. In each of these cases, the operator would have the option of contesting the citation issued and presenting to an administrative law judge the reasons why the disputed plan provision should have been approved. "Likewise, [MSHA] would present [its] reasons for revoking or denying approval." *Id.* The manual's description of the hearing before the ALJ does not indicate the standard of review to be applied.

This analysis of the historical development of the statutory provisions at issue establishes that the "technical violation" method of seeking review of an impasse in the development of a ventilation plan developed first through judicial suggestion and then through custom and agency practice. Congressional approval came obliquely at first through mention in legislative

history and then more directly through somewhat parallel legislation governing emergency response plans. Nevertheless, the issue of the appropriate standard of review to apply to the conclusion of this process has not been addressed.

**3.**

Our examination of the overall text of the statute reveals that it is not at all clear that Congress ever focused explicitly on the appropriate standard of review for the Secretary's refusal to approve a mine ventilation plan. The statutory text, read as a whole, makes clear that the process of approving a ventilation plan proposed by the mine operator is a significantly different task than issuing a citation for the violation of an established standard. Put in its simplest terms, it involves the *formulation* of a standard, not the *enforcement* of a standard. It requires the gathering of information by the mine operator and its presentation to the district manager, the manager's examining and assessing that material and considering the views of the operator on the appropriateness of the plan. At bottom, it entails the exercise of the Secretary's independent judgment as to the appropriateness of the plan to ensure the health and safety of the miners. There is, in other words, a congressional mandate that the Secretary exercise independent judgment that the plan safeguards those whom it is designed to protect. The plan as finally implemented must reflect the Secretary's best judgment that the mine is indeed safe for miners. *See* 30 U.S.C. § 863(o). We further note that, in enacting the legislation dealing with ventilation plans, Congress did not affirmatively enact the "technical violation"

approach to obtaining review of secretarial denials of plans proposed by mine operators. This scheme was the product of agency custom and practice. It is clear, however, that Congress became aware of the practice and, indeed, later implemented it in the area of emergency response plans.

As part of their argument, Mach points us to 30 U.S.C. § 815(d), which specifies that proceedings before the Commission are to be conducted in accordance with section 554 of the APA. Appellant's Br. 19-20. Section 556(d), which applies to hearings under section 554, provides for de novo review.[20] When enacted, this provision was placed in the statute to ensure that those accused of violating an established regulation were accorded a full opportunity to demonstrate that they had not acted as the Secretary alleged. The advent of the "technical violation" to review the Secretary's refusal to approve a ventilation plan simply was not before Congress when it initially enacted the provision. When Congress finally acknowledged the existence of the practice, or even when it implemented it in the emergency response legislation, it did not address whether the standard of review regularly involved in reviewing violations of established rules should be imported to the review of denials of secretarial approval of ventilation plans.

In our view, the use of a de novo standard to review such secretarial refusals runs into a substantial statutory barrier. Use of such a de novo standard of review in the ventilation plan

---

[20]  *See Steadman*, 450 U.S. at 102 (holding that the standard of proof that applies in hearings governed by section 556 of the APA is the preponderance of evidence).

situation would undermine—substantially—the specific statutory language of 30 U.S.C. § 863(o) that the implemented plan must be one approved by the *Secretary*, not by the Commission. This statutory provision makes clear that the Secretary's role of approving the plan is not really an enforcement role susceptible to de novo review, but rather a role imbued with a legislative or policy-making dimension to ensure that the plan is reflective of the public interest in mine safety. As we have noted earlier, in its earliest acknowledgment of the use of the "technical violation" approach to review secretarial denials, the Senate Committee specifically "caution[ed]" that "the *Secretary* must independently exercise his judgment with respect to the content of such plans in connection with his final approval of the plan." S. Rep. No. 95-181 at 25, *reprinted in* 1977 U.S.C.C.A.N. at 3425 (emphasis added). That warning was embodied in section 863(o). We therefore cannot accept Mach's argument that the foregoing analysis is basically a "policy argument." Reply Br. 3.

In light of the statutory text and its history, we conclude that the majority of the members of the Commission correctly determined that the decision of the Secretary to withhold approval of the ventilation plan is reviewable under the abuse of discretion standard. To permit the Commission to substitute its view for that of the Secretary simply would displace entirely the expertise of the Secretary from the determination of the appropriate safety standards for mine ventilation, a situation

clearly contrary to the intent of the statutory scheme mandated by Congress. [21]

Our conclusion is consistent with the Supreme Court's discussion of the roles of the Secretary and OSHRC in *Martin v. OSHRC*, 499 U.S. 144. In determining that the Secretary's interpretation, rather than OSHRC's, should receive deference, the Supreme Court noted that the Secretary, as the entity responsible for promulgating and enforcing the statute, has policymaking expertise and is

> in a better position than is the Commission to reconstruct the purpose of the regulations in question. Moreover, by virtue of the Secretary's statutory role as enforcer, the Secretary comes into contact with a much greater number of regulatory problems than does the Commission, which encounters only those regulatory episodes resulting in contested citations … . Because historical familiarity and policymaking expertise account in the first instance for the presumption that Congress

---

[21] We recognize that past Commission decisions required the Secretary to bear the burden of proving, by preponderance of the evidence, that the Secretary's plan was suitable and that the mine operator's plan was unsuitable, *see, e.g.*, *Sec'y of Labor v. Peabody Coal Co.*, 15 FMSHRC 381, 388 (1993), and that the Commission generally must explain its decision to depart from its own precedent, *Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013). Our conclusion that the statute's regulatory scheme requires the Commission to review the Secretary's decision to approve or reject a ventilation plan under a more deferential standard, however, makes further explanation by the Commission unnecessary in this case.

delegates interpretive lawmaking power to the agency rather than to the reviewing court, we presume here that Congress intended to invest interpretive power in the administrative actor in the best position to develop these attributes.

… .

For the same reason, we reject the Court of Appeals' inference that Congress intended to endow the Commission with the normal complement of adjudicative powers possessed by *traditional* administrative agencies.

*Id.* at 152-54 (citations omitted) (internal quotation marks omitted).

**B.**

Having determined that the Commission was correct in its conclusion that the Secretary's decision ought to be reviewed deferentially, we must determine whether the Commission's decision can be sustained on review before this court. Unlike the situation that has occupied us in the earlier pages of this opinion, the standard by which *we* review the orders of the Commission is well settled. We review the factual findings of the Commission to ascertain if they are supported by substantial evidence, 30 U.S.C. § 816(a); we review questions of law de novo, *Zeigler Coal Co. v. Kelley*, 112 F.3d 839, 841 (7th Cir. 1997); and we review the ALJ's evidentiary rulings for an abuse of discretion, *Lakeland Enters. of Rhinelander, Inc. v. Chao*, 402 F.3d 739, 745 (7th Cir. 2005).

**1.**

Mach contends that the ALJ's incorrect application of an
arbitrary and capricious standard of review led her to exclude
or unfairly discount its evidence and the testimony of its
experts, thus preventing Mach from fully presenting its case.
Appellant's Br. 38. Our earlier discussion and conclusion
forecloses this line of argument. We note that the ALJ did allow
Mach's witnesses to testify, considered their testimony and
provided a reasoned explanation both for discounting their
testimony and for accepting the testimony of the Secretary's
witnesses.[22]

**2.**

Examining the merits, although Mach contends that it was
entitled to a de novo review before the ALJ, it does not argue
that, if the arbitrary and capricious standard applies, there is
insufficient evidence to sustain the decision of the district

---

[22]  *See, e.g.*, *Mach Mining, LLC v. Sec'y of Labor*, 32 FMSHRC 149, 158 (2010)
(finding one of Mach's witnesses less credible because he testified from
notes handed to him by his attorney); *id.* (noting that Mach's expert failed
to address MSHA's recommendations); *id.* at 159 (concluding that the
Secretary's position was based on legitimate facts and Mach presented no
real evidence to the contrary); *id.* at 160 (determining that the Secretary
demonstrated a need for ventilation controls and noting that Mach's expert
failed to explain how it would avoid a short circuit in the air flow without
controls).

manager.[23] It also does not maintain that the district manager failed to follow the general regulations with respect to mines or the various directives promulgated by the Secretary to ensure comprehensive review of a submitted plan. Nor does it contend that the district manager acted arbitrarily in refusing to review any information that Mach submitted to him.

Mach does submit, however, that it was unaware "of the full range of disagreements MSHA would have with its ventilation plan for panel 3." Appellant's Br. 42. It alleges that MSHA never fully articulated its rationale for rejecting Mach's ventilation plan during informal negotiations, which prejudiced Mach at the hearing before the ALJ. At bottom, Mach claims that the district manager failed to negotiate in good faith, *see Sec'y of Labor v. C.W. Mining Co.*, 18 FMSHRC 1740, 1747 (1996) (explaining that good faith negotiations include "notice of a party's position and adequate discussion of disputed provisions"), contrary to the negotiation procedures required by the Commission, *see Sec'y of Labor v. Carbon Cnty. Coal Co.*, 7 FMSHRC 1367, 1371 (1985). However, the ALJ found that the negotiations between Mach and the district manager *did* satisfy the good faith requirement. Specifically, she noted "that the Secretary and Mach had extensive back and forth discussions over a period of eight months" and that those discussions "included telephone calls, emails, letters and meetings, at both the district and national

---

[23] Mach's statement of the issues asserts that the ALJ's decision was not supported by substantial evidence, Appellant's Br. 2, but its brief on this issue focuses only on what the ALJ could have found under a de novo standard of review, *id.* at 44.

level. During the negotiations both parties made adjustments in their positions regarding the issues. The discussions were ongoing and, based upon those talks, several of the issues were removed from consideration." *Mach Mining, LLC*, 32 FMSHRC at 151. Mach's brief does not point to any evidence to the contrary.

We thus affirm the Commission's decision on the evidentiary issue and on the merits.

### Conclusion

For the above reasons, we must deny the petition for review.

PETITION DENIED