**PUBLISH**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

--------------------------------------------

## No. 98-6159

--------------------------------------------

## Rule No. 68372

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
09/04/98
THOMAS  K. KAHN
CLERK

**NATIONAL MINING ASSOCIATION, ALABAMA COAL ASSOCIATION,**

Petitioners,

versus

**SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, et al.,**

Respondents.

-----------------------------------------------------------------

## Petition for Review of an Order
## of the Mining Safety and Health Administration

-----------------------------------------------------------------

**(September 4, 1998)**

Before EDMONDSON and BIRCH, Circuit Judges, and STAFFORD\*, Senior District Judge.

_____

\*      Honorable William Stafford, Senior U.S. District Judge for the Northern District of Florida, sitting by designation.

**EDMONDSON, Circuit Judge:**

The National Mining Association and the Alabama Coal Association ("NMA") dispute a finding of the Mining Safety and Health Administration ("MSHA") that allows testing the amount of coal dust in mines by using measurements taken over a single shift, rather than traditional multi-shift measurements. NMA challenges the new sampling method on substantive and procedural grounds. We vacate the finding.

2

# Background

One of the reasons Congress passed the Federal Coal Mine and Safety Act ("the Coal Act") in 1969 was to reduce the amount of coal dust inhaled by coal miners. The dust was known to cause Black Lung Disease. The Coal Act provided interim standards for the maximum amount of coal dust permitted in coal mines as well as guidance on how to measure the level of

coal dust in a mine's atmosphere. The interim standards were effective until the Secretaries' created improved health standards. Relevant provisions of the Coal Act were re-enacted in the Federal Mine Safety and Health Act of 1977 ("the Mine Act"). See 30 U.S.C. §§ 801-962 (1994).

---

[1] Throughout this opinion, "the Secretary" normally means the Secretary of Labor. MSHA is part of the Department of Labor. Under the Coal Act, however, the Secretaries meant the Secretary of the Interior and Secretary of Health, Education, and Welfare.

This dispute revolves around several provisions of the Mine Act. Under 30 U.S.C. § 841(a) the Secretary has authority to supersede the "interim mandatory health and safety standards" of the Mine Act with "improved mandatory health and safety standards." But the Secretary must enact the new standards according to the provisions of Section 811. See 30 U.S.C. § 811(a). Section 811(a)(6) is at the heart of the current controversy. It states the Secretary "shall set standards" that

adequately assure, on the basis of the "best available evidence" that no miner will suffer "material impairment of health" under the new standard and that the Secretary shall also consider the "latest available scientific data in the field, the feasibility of the standards, and experience gained under this and other health and safety laws."

Other pertinent provisions of the Mine Act include Section 842(b)(2) which requires that the "average concentration"

of coal dust to which a miner is exposed during each shift not exceed 2.0 milligrams per cubic meter of air (2.0 mg/m³). Average concentration is defined as a concentration that

> accurately represents the atmospheric conditions with regard to respirable dust to which each miner . . . is exposed . . . over a single shift only, unless [the Secretary] finds in accordance with . . . Section 811 . . . that such single shift measurement will not, after applying valid statistical techniques to such measurement, accurately represent such atmospheric conditions during such shift.

30 U.S.C. § 842(f).

In 1971, MSHA's predecessor, the Bureau of Mines, proposed a finding that single-shift sampling would not accurately represent the atmospheric conditions of a mine. See 36 Fed. Reg. 13286 (1971). The proposed finding was made final in 1972. See 37 Fed. Reg. 3833 (1972). MSHA now wishes to rescind the 1971/72 finding and to begin single-shift sampling.

In attempting to rescind the 1971/72 finding, MSHA published two notices in the

Federal Register. The first, published in February 1994, stated MSHA's plan to rescind the 1971/72 finding and replace it with a single, full-shift measurement of the atmospheric conditions. *See* 59 Fed. Reg. 8357 (1994). The second, published simultaneously, stated that citations would be issued based on single-shift sampling. *See* 59 Fed. Reg. 8356 (1994).

Single-shift sampling – in part – grew out of MSHA's Spot Inspection Program ("SIP"), itself designed to defeat suspected

9

tampering of dust samples by mine operators. See 63 Fed. Reg. 5664, 5667 (1998). After the SIP, MSHA concluded that multi-shift sampling was inaccurate because multi-shift sampling did not lead to citations in places where the SIP had shown miners to be overexposed. See id. at 5668. The Federal Mine Safety and Health Review Commission, however, vacated citations issued under the SIP because of MSHA's failure to comply with the rulemaking procedures in Section 811. See

_Secretary of Labor v. Keystone Coal Mining Corp._, 16 FMSHRC 6 (1994).

Another reason given by MSHA for rescinding the 1971/72 finding is the improvement in air sampling technology. _See_ 63 Fed. Reg. 5664, 5666 (1998). Since 1971, significant improvements have been made to calibration procedures, weighing accuracy, and sampling pumps. _See id._

The accuracy of single-shift sampling is hotly debated by the parties. NMA argues

that single-shift sampling is so inaccurate that a large number of citations will be erroneously issued to coal mine operators. MSHA counters that single-shift measurements are more accurate because they tend to expose spatial or temporal peaks in dust levels that would, under a multi-shift measurement, be masked by some measurements below the 2.0 mg/m³ threshold when averaged with the peak values. See id. at 5689. MSHA supports this

12

conclusion by pointing out that multi-shift measurements were always highest during the first measured shift: it was only after the first shift, says MSHA, that operators had time to affect dust production. See id. at 5668.

Because of this debate, the period for public comment was extended several months, and two public hearings were held about the notices. See, e.g., 61 Fed. Reg. 18158 (1996). As a result of the comments, MSHA

defined "accurately represent[]" (as used in 30 U.S.C. § 842(f)), re-opened the comment period, and held a public hearing on the new definition. See 61 Fed. Reg. 10012, 10013 (1996).

In February 1998, MSHA issued the subject of our review, the Joint Finding and Noncompliance Determination Notice ("the Joint Finding") which rescinded the 1971/72 finding. See 63 Fed. Reg. 5664 (1998).

# Discussion

NMA raises procedural objections under the Mine Act, the Administrative Procedure Act ("APA"), and the Regulatory Flexibility Act ("RFA"), and substantive objections to the Joint finding. We will address only the procedural objections.

## A. The Mine Act

NMA says that the procedural requirements of the Mine Act, in 30 U.S.C. § 811, were not met by MSHA's Joint Finding. MSHA makes two arguments in response. First, the use of single-shift measurements is no mandatory health and safety standard and, therefore, does not need to comply with Section 811. Second, if the Joint Finding is a mandatory health and safety standard, MSHA argues, the Joint Finding complied with the procedural

requirements of Section 811. In arguing that the Joint Notice complied with Section 811, however, MSHA insists that portions of Section 811 do not contain procedural requirements.

An agency's interpretation of its governing statute is often given significant deference. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842-43 (1984). But, when applying *Chevron*'s first step, we do not

need to defer when the issue is a "pure question of statutory construction." *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987). Likewise, we need not defer to issues beyond the agency's expertise. *See Morris v. CFTC*, 980 F.2d 1289, 1293 (9th Cir. 1992); *see also Colorado Public Utils. Comm'n v. Harmon*, 951 F.2d 1571, 1579 (10th Cir. 1991) (not deferring on issue of preemption); *Lynch v. Lyng*, 872 F.2d 718, 724 (6th Cir.

1989) (not deferring on issue of statute's effective date).

Because deciding if MSHA must address the requirements of Section 811(a)(6) is a question of pure statutory construction, we need not defer to MSHA's interpretation. We conclude that MSHA's various interpretations of Section 811(a)(6) — as we shall explain — are incorrect.

Use of single-shift measurements by MSHA is a health and safety standard. Mandatory health and safety standard is defined, in Section 802(/) as "the interim mandatory health or safety standards" between Section 841 and Section 846. Section 842(f) is the basis for single-shift sampling. Furthermore, Section 841(a) refers to Sections 842-846 as "interim mandatory health standards." At a minimum, therefore, Section 842(f) is an

interim mandatory health standard. Section 841(a) continues, however, to say that the interim mandatory health standards of Sections 842-846 are effective "until superseded in whole or in part by improved mandatory health standards." Single-shift sampling supersedes multi-shift sampling, which was based on Section 842(f). Single-shift sampling, therefore, is an "improved mandatory health standard." See United

_Mine Workers v. Dole_, 870 F.2d 662, 671 (D.C. Cir. 1989) (the term "mandatory standard" includes standards adopted to replace an existing mandatory standard); _id._ at 672 (concluding Section 811(a)(9) is a mandatory standard). According to Section 841(a), any new standard must be "promulgated . . . under the provisions of Section 811."[2]

_____

[2] MSHA argues that not all the provisions of Sections 842-846 can require rulemaking in accordance with Section 811. But, Section 841 makes no distinction between the provisions in

The reasoning of the Federal Mine Safety and Health Review Commission ("the Commission") in Secretary of Labor v. Keystone Coal Mining Corp., 16 FMSHRC 6, 13 (1994) supports our conclusion that MSHA's new sampling method is a mandatory

---

Sections 842-846 when it requires the Secretary to comply with Section 811 requirements. Also, Section 842(f) is distinct from the other provisions in that it contains an explicit requirement for the Secretary to comply with Section 811 procedures. See 30 U.S.C. § 842(f). Still, these provisions are not at issue today, and we do not decide if Section 811 requirements apply to them.

health standard. In _Keystone_, the Commission rejected MSHA's argument that single-shift measurements did not require following Section 811 procedures. Section 842(f), said the Commission, explicitly requires MSHA to follow Section 811 procedures if the Secretary decides not to use single-shift measurements. This intent — to use Section 811 procedures if rejecting single-shift measurements — "bespeaks an equal intent that, once such a

finding is made, it may be rescinded only"

by following Section 811 procedures.  *Id.*

MSHA next argues that it did comply
with Section 811, but that MSHA must only
comply with the procedure-setting portions
of Section 811.  MSHA says Section 811(a)(6)
contains no procedure-setting provisions.[3]

---

[3] In the alternative, MSHA argues that the 2.0 mg/m$^3$ standard encompasses the Section 811(a)(6) requirements.  In other words, MSHA argues that, so long as they do not alter the 2.0 mg/m$^3$ standard, then the improved mandatory health standard is automatically feasible, does not materially impair miners' health, and is based on the best available

We think MSHA's interpretation is incorrect.

The plain language of Sections 842(f) and 841(a) requires mandatory health or safety standards to be made "under" or "in accordance with" the "provisions of section 811." No restriction suggests that MSHA must comply only with the <u>procedures</u> in Section 811. Where Congress sought to refer
_____

scientific evidence. The plain language of Section 841(a), however, states that Section 811 standards apply to Sections "842 <u>through</u> 846." 30 U.S.C. § 841(a) (emphasis added).

26

only to the procedural aspects of Section 811, it did so clearly. <u>See</u> 29 U.S.C. § 811(b)(2) ("A temporary mandatory health or safety standard shall be effective until superseded by a mandatory standard promulgated in accordance with <u>the procedures</u> prescribed in [Section 811(a)(3)].") (emphasis added).

Our conclusion using the statute's plain meaning is supported by three additional points. First, Section 811(a)(6) says that MSHA shall consider the feasibility of the

standards. The language is not discretionary. Second, MSHA, in more recent rulemakings, recognizes the requirement to address feasibility. See 63 Fed. Reg. 17492, 17558 (1998) (addressing feasibility of proposed rule on diesel engine exhaust in mines).[4] Third, MSHA is

_____

[4] We fail to understand MSHA's argument that the diesel rulemaking is inapplicable because it applies to operators, whereas single-shift sampling applies to MSHA inspectors. Section 811 makes no such distinction. In addition, MSHA uses inspector sampling to cite and fine mine operators so, in this respect, changes to the inspector

reversing its prior policy on sampling. Proper procedures are particularly important where, as here, MSHA's predecessor studied and rejected single-shift sampling.

To use single-shift measurements, then, MSHA must follow all the provisions of Section 811. We conclude MSHA has not done so.

Section 811 requires notice, the opportunity for public comment, public

_____

sampling program do apply to operators.

29

hearings if requested, and final publication in the Federal Register. There can be little doubt, as detailed in the facts above, that MSHA satisfied these requirements. But as we have explained, MSHA must also satisfy the requirements of Section 811(a)(6). Therefore, MSHA must demonstrate that the new standard (a) adequately assures that no miner will suffer a material impairment of health, on the basis of the best available evidence; (b) uses the latest

available scientific data in the field; (c) is feasible;[5] and (d) is based on experience gained under the Mine Act and other health and safety laws. <u>See</u> 30 U.S.C. § 811(a)(6)(A).

After a review of the record, we conclude that the record contains no finding of economic feasibility. The

---

[5]"Feasibility" under OSHA means technological and economic feasibility. <u>See</u> <u>Color Pigments Mfrs. Ass'n v. OSHA</u>, 16 F.3d 1157, 1161 (11th Cir. 1994). We believe the Mine Act term "feasibility" includes these concepts as well, but we do not otherwise address the applicability of OSHA.

absence of a showing of economic feasibility is not surprising because MSHA insisted, in the Joint Finding, that "there is no need to address feasibility." 63 Fed. Reg. 5664, 5669 (1998).[6]

---

[6] At oral argument, MSHA's counsel suggested that the Regulatory Flexibility Analysis (discussed in note 7) contained a study of economic feasibility. But, "[b]urdened by the view that [Section 811(a)(6)] was advisory, MSHA neither explored for itself nor elicited comments" regarding the economic feasibility of single-shift sampling. United Mine Workers, 870 F.2d at 674. Determining if a regulation will have a "significant economic impact on a substantial number of small [or large]

We conclude, therefore, that MSHA failed

to comply with Section 811(a)(6) of the Mine

---

entities," under the RFA, is not the same as deciding if the rule is economically feasible.

Act. So we must vacate the Joint Finding.[7]

---

[7] We will address NMA's other procedural objections. NMA makes two challenges under the Administrative Procedure Act. We reject NMA's first argument that MSHA failed to provide notice of its plan to apply the Joint Finding to surface mines. MSHA's inspector sampling program – the program altered by single-shift sampling – has applied to surface mines since the program's inception. Also, MSHA referred to 30 C.F.R. § 71 – regulating surface mines but not underground mines – several times during the rulemaking. We note that NMA submitted comments referencing 30 C.F.R. § 71. We also reject NMA's second argument, that MSHA relied on undisclosed material for the Joint Finding. The information used by MSHA after the record closed was not new or critical to the Joint Finding.

**VACATED.**

---

NMA also challenges the Joint Finding under the Regulatory Flexibility Act, 5 U.S.C.A. § 603 (West Supp. 1998) ("RFA"). We reject this argument. We find the Secretary's certification that single-shift Sampling will not have a "Significant economic impact on a Substantial number of small entities" meets the requirements of Section 605(b), but — as discussed in note 6 — does not demonstrate the rule's economic feasibility.