[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-14309

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Dec. 15, 2009
THOMAS K. KAHN
CLERK

Agency No. 108-V-03

NATIONAL MINING ASSOCIATION,
ALABAMA COAL ASSOCIATION,

Petitioners,

versus

SECRETARY OF LABOR,
MINE SAFETY AND HEALTH ADMINISTRATION,

Respondents.

_____

Petition for Review of a Decision of the
Federal Mine Safety & Health Administration

_____

Before DUBINA, Chief Judge, BIRCH and SILER,[*] Circuit Judges.

BIRCH, Circuit Judge:

_____

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

The National Mining Association and Alabama Coal Association (together "NMA") dispute Procedure Instruction Letter I08-V-03 ("PIL") promulgated by the Secretary of Labor's Mine Safety and Health Administration ("MSHA"). NMA challenges the PIL on substantive and procedural grounds. After careful review, we find the PIL to be a general statement of policy and DISMISS for lack of subject-matter jurisdiction.

## I. BACKGROUND

The Federal Coal Mine Health and Safety Act of 1969, redesignated the Federal Mine Safety and Health Act of 1977 ("Mine Act"), governs and regulates coal mines throughout the United States. See 30 U.S.C. § 801(g). The Mine Act itself established certain "interim" mandatory health and safety standards, but also authorized MSHA, originally through its predecessor, the Bureau of Mines, to promulgate new or revised standards. See id. §§ 801(g)(1), 811(a), 841(a); Nat'l Mining Ass'n v. Sec'y of Labor, 153 F.3d 1264, 1266 (11th Cir. 1998).

Since the Mine Act, MSHA has promulgated mandatory health standards governing the exposure of coal miners to respirable dust in underground coal mines as part of its mandatory health standards for underground mines. See 30 C.F.R. 70.100. MSHA regulations require mine operators to conform operations to certain standards, such as "maintain[ing] the average concentration of respirable dust in the mine atmosphere . . . at or below 2.0 milligrams of respirable dust per

cubic meter of air" and "maintain[ing] the average concentration of respirable dust within 200 feet outby the working faces of each section in the intake airways at or below 1.0 milligrams of respirable dust." Id. at § 70.100(a),(b).  The regulations further require mine operators to take respirable dust samples and to develop and follow a ventilation plan approved by the district manager.  Id. at §§ 70.207(a), 75.370; see also United Mine Workers of Am., Int'l Union v. Dole, 870 F.2d 662, 667-68 (D.C. Cir. 1989) (describing how federal regulations require mine operators to develop plans to address specific safety issues like roof control and ventilation and explaining that the specific content of any individual mine plan is determined through consultation between the mine operator and district manager and may incorporate requirements to supplement or supplant standards set out in the enumerated criteria so long as these alternative requirements protect miners at least as much as the enumerated criteria).

During the course of coal mining, mine operators penetrate (dig) into the earth, support the underground shafts (penetrated holes) through permanent roof supports, and extract coal from the point of deepest penetration known as the "working face" of the mine.  When the working face extends beyond the last row of permanent roof supports by more than twenty feet, the operator is said to be making an "extended cut."  PIL No. I08-V-03 at 1 ("An extended cut (deep cut) is defined as any cut in which the on-board manual controls of the continuous mining

3

machine are advanced inby the last row of permanent roof supports . . . more than 20 feet . . .”). Although not specifically addressed by codified regulations, the extended cut practice does relate to two highly regulated areas of coal mining: ventilation and roof control.

Current regulations require ventilation control devices be installed at a distance no more than ten feet from the working face unless MSHA (through a district manager) approves a greater distance in the ventilation plan. See 30 C.F.R. §§ 75.330(b)(2). Regulations also require roof supports within so many feet of the working face unless district managers approve greater distances in roof control plans. See id. §§ 75.202-75.220 (prescribing distance requirements for temporary and permanent roof supports and procedures for roof control plan submission and approval). In practice, after evaluating a particular mine, district managers regularly approve working face distances that exceed those specified in the regulations to accommodate the needs of mine operators.

To help MSHA enforcement personnel, like district managers, with uniform regulation practices, the Administrator for Coal Mine Safety and Health periodically issues Procedure Instruction and Program Policy Letters. See United States Department of Labor Mine Safety & Health Administration, Frequently Asked Questions: What is a PIL? (Nov. 30 2009), available at http://www.msha.gov/faq/faqhome.htm. These letters “state agency policy,

4

meaning an interpretation or clarification of a regulation . . . [and] are intended for the mining community as well as MSHA enforcement personnel." Id. The PIL at issue in this case states that its purpose is to give "direction" to MSHA enforcement officials (district managers) for evaluating and approving extended cut plans. PIL No. I08-V-03 at 1. It states further:

> These procedures provide a systematic approach for evaluating new extended-cut approval requests. An on-site evaluation will be made to assess the adequacy of a proposed plan to determine if extended cuts can be made without adversely affecting the health and safety of miners . . . District managers are strongly encouraged to consider whether approval of an extended cut plan is appropriate if MSHA collected respirable dust samples indicate a dust concentration of greater than the applicable standard or quartz concentration that exceeds 100 ug/m3."

Id. at 2, 6. In short, the PIL describes a standard policy procedure, and standard factors – with objective measurement ranges – for district managers to consider when they evaluate a mine operator's extended cut plan. NMA argues that the new standards described in the PIL function as a de facto mandatory standard promulgated without adherence to the procedural notice and comment requirements of the Mine Act and the Administrative Procedures Act ("APA"), 5 U.S.C. § 551 et seq.

## II. DISCUSSION

The Mine Act authorizes MSHA to promulgate new or revised "improved" standards, as appropriate, in accordance with the rulemaking procedures of the

5

APA as well as the specific rulemaking procedures of the Mine Act itself.  See 30

U.S.C. §§ 811(a), 841(a).  When MSHA promulgates a new or revised mandatory

standard, it is obligated to publish the proposed rule in its entirety in the Federal

Register, give the public and the regulated community an opportunity to comment

and raise objections, and hold a public hearing on any objections to the standard if

one is requested.  See id. at § 811(a)(2), (3).  The courts of appeals have exclusive

jurisdiction over challenges to the validity of a mandatory standard.  See id. at §

811(d).

The PIL in question here was issued directly as a letter from the

Administrator for Coal Mine Safety and Health.  MSHA admits that the letter did

not go through formal notice and comment procedures.  Therefore, if the PIL is

found to be a mandatory standard, MSHA would have violated the APA and Mine

Act by not following the prescribed notice and comment requirements.

Conversely, if the PIL is not a mandatory standard, but instead a general statement

of policy, we would lack subject-matter jurisdiction to hear any challenge.

We have previously delineated the difference between a legislative rule, to

which notice and comment requirements apply, and a general statement of policy,

to which they do not:

> Generally, whether a particular agency proceeding announces a rule or
> a general policy statement depends upon whether the agency action
> establishes a binding norm.  The key inquiry, therefore, is the extent

6

to which the challenged policy leaves the agency free to exercise its discretion to follow or not to follow that general policy in an individual case, or on the other hand, whether the policy so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion. As long as the agency remains free to consider the individual facts in the various cases that arise, then the agency in question has not established a binding norm.

Ryder Truck Lines, Inc. v. United States, 716 F.2d 1369, 1377 (11th Cir. 1983) (quotation marks and internal citations omitted). Additionally, in determining whether an agency has issued a binding norm or a policy statement, courts have looked at: (1) the agency's expressed intentions as reflected by its characterization of the statement, (2) whether the statement was published in the Federal Register or the Code of Federal Regulations, and (3) whether the action has binding effects on private parties. Center for Auto Safety v. Nat'l Highway Traffic Safety Admin., 452 F.3d 798, 806 (D.C. Cir. 2006).

NMA cites Nat'l Mining Ass'n, 153 F.3d at 1266 for the conclusion "that if MSHA intends to change the existing mandatory respirable dust program, it must do so by . . . notice and comment rule making." Petr.'s Resp. to Juris. Ques. 14. In that case, however, there was no dispute that MSHA had already engaged in rulemaking per se. Rather, the central question was whether that rulemaking was procedurally sound. Nat'l Mining Ass'n, 153 F.3d at 1267-69. While the court did speak to procedures changing dust sampling measurements as requiring notice and

comment rulemaking, the court's language was in the context of new formal procedures published in Federal Register notices controlling every coal mine air sampling procedure. Id. at 1266-68. The novel concern in the procedures described in that case were more technologically advanced and accurate air sampling equipment necessitating fewer air samples be taken for every air sampling procedure involved in coal mines. Id. In contrast, the PIL procedures at issue in this case only speak to air sampling in the context of extended cut plans – a territory far narrower than a broad published rule regarding every coal mine air sample taken. See PIL No. I08-V-03 at 1.

The distinguishing issue in this case is that the PIL relates only to extended cut plans, which are by their very nature an exception to the general federal regulations in place. Current regulations require mine operators to take mine shaft infrastructure measures within a few feet of the working face. See, e.g., 30 C.F.R. § 75.330(b)(2) (requiring ventilation devices within ten feet of the working face). The exception to this rule is that district managers may, on a case-by-case basis, approve ventilation plans that exempt mine operators from the normally-required infrastructure measures. Id. Accordingly, the PIL adjustments to the case-by-case extended cut regulation exceptions are by their very nature contingent on the "individual facts in the various cases that arise" and thus not "a binding norm." Ryder Truck Lines, Inc., 716 F.2d at 1377.

8

Moreover, supporting the conclusion that the PIL is merely a general statement of policy one need only look at the advisory and permissive language of the PIL itself. When MSHA speaks in rule-making form, it speaks directly. See, e.g., 30 C.F.R. 70.100(b) ("Each operator shall continuously maintain . . . respirable dust within 200 feet outby the working faces . . . at or below 1.0 milligrams of respirable dust per cubic meter of air . . .") (emphasis added). The PIL, on the other hand, states general considerations, such as, "[d]istrict managers are strongly encouraged to consider whether approval of an extended cut plan is appropriate." PIL No. I08-V-03 at 6 (emphasis added). The PIL also states that certain information, like mine history, cut sequence limitations, and what is included in a ventilation plan, "should" be considered. Id. at 1-7. By its terms, the PIL thus addresses the general procedures district managers are to consider when evaluating a discretionary extended cut plan. The agency, through district managers, is therefore "free to consider the individual facts" when evaluating each specific mine. Ryder Truck Lines, Inc., 716 F.2d at 1377.

In summary, mine operators are required to follow certain operating procedures. Within practice, however, district managers can – and regularly do – grant exceptions so that operators can make extended cuts. To create more uniformity during the course of granting these exceptions, MSHA – through the PIL – issued a general policy procedure for district mangers to follow. NMA

9

challenged this procedure arguing that it creates new across-the-board rules for mine operators to follow.  This is not the case.  Operators have been given a proverbial "inch" with discretionary grants by district managers.  Now that MSHA has attempted to create a more uniform policy with the exceptions to the rules, mine operators, through NMA, attempt to take a proverbial "mile" by limiting the discretion of district mangers.  Given that the whole context of the PIL is in a subject area controlled by individual case-by-case discretion, the PIL is by its very nature not a binding rule.

### III. CONCLUSION

NMA challenges PIL I08-V-03 as being a de facto mandatory standard promulgated without the procedural notice and comment requirements of the Mine Act and APA.  As we have explained, we find the PIL to be a general statement of policy.  Accordingly, we DISMISS for lack of subject-matter jurisdiction.

**DISMISSED.**