# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 23, 2014        Decided June 26, 2015

No. 13-1315

PRAIRIE STATE GENERATING COMPANY LLC,
PETITIONER

v.

SECRETARY OF LABOR AND FEDERAL MINE SAFETY AND
HEALTH REVIEW COMMISSION,
RESPONDENTS

On Petition for Review of a Decision of the
Federal Mine Safety & Health Review Commission

*Ralph Henry Moore*, *II* argued the cause for petitioner. With him on the briefs was *Patrick W. Dennison*.

*Edward Waldman*, Attorney, Mine Safety & Health Administration, argued the cause for respondents. With him on the brief was *W. Christian Schumann*, Counsel. *John T. Sullivan*, Attorney, entered an appearance.

Before: HENDERSON and PILLARD, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: Coal powers almost 40% of the electricity used in the United States. Despite enormous safety advances in recent decades, underground coal mining remains one of the handful of the nation's most dangerous jobs. Cave-ins, and dusts or gases that pose respiratory or explosion risks, are leading causes of harm to coal miners.[1] Congress enacted the Federal Mine Safety and Health Amendments Act of 1977 (the Mine Act) to protect America's miners. The Mine Act subjects mine operators to substantial safety regulation, under rules generally applicable to all mines, as well as mine-specific safety plans suited to the particular geologic conditions and the operator's chosen mining system. Operators must propose mine-specific plans for the approval of the Secretary of Labor, who acts for those purposes through a district manager in the Mine Safety and Health Administration (MSHA). The Mine Act established the Federal Mine Safety and Health Review Commission, an independent agency, to review operators' challenges to citations and orders the Secretary imposes under the Act. Petitioner Prairie State Generating Company, LLC (Prairie State) challenges the Commission's decision to sustain the Secretary's citations against it for operating without approved, mine-specific plans for roof support and ventilation at Prairie

---

[1] *See, e.g.*, U.S. Energy Info. Admin., *Electric Power Monthly* Table 1.1 (May 2015), *available at* http://www.eia.gov/electricity/monthly/pdf/epm.pdf; News Release, U.S. Dep't of Labor, MSHA, Roof fall accidents remain a leading cause of coal mining injuries, U.S. Dep't of Labor (July 2, 2014), *available at* http://www.msha.gov/MEDIA/PRESS/2014/NR140702.asp; *Mining: Inputs: Occupational Safety & Health Risks*, Ctr. for Disease Control & Prevention, http://www.cdc.gov/niosh/programs/mining/risks.html (last visited June 1, 2015).

State's underground coal mine at Lively Grove in southern Illinois. After extensive consultation over the terms of mine-specific safety plans that would be suitable at Lively Grove, the MSHA district manager had declined to accept the final terms that Prairie State proposed. In order to create an opportunity to challenge the district manager's plan-suitability decisions, Prairie State momentarily operated the mine without approved roof-support and ventilation plans and so incurred two citations, which it challenges here.

The principal question before us is which standard the Commission should use when it reviews the Secretary's citation of an operator for failure to follow an approved, mine-specific plan. The Secretary defends arbitrary-and-capricious review as appropriately deferential to his judgments because the Department of Labor is the agency charged under the Mine Act with expert policymaking discretion to evaluate and approve mine-specific safety plans. Prairie State, by contrast, argues for *de novo* review on the ground that the Secretary will not have carried his acknowledged burden to prove the basis for a citation unless he establishes, without the benefit of deference, the *un*suitability of an operator's proposed plan. Prairie State claims two further legal errors: First, that the Commission erred as a matter of law by not considering evidence that, Prairie State contends, is relevant notwithstanding that it was not submitted to the district manager when he decided plan suitability; and second, that the district manager erroneously relied on an MSHA Procedure Instruction Letter as a binding, across-the-board norm in derogation of his duty to make a case-specific judgment. Finally, Prairie State points out various ways in which, even if the suitability determinations were reviewed with deference, it believes the determinations were contrary to law and unsupported by substantial evidence.

We hold that that the Secretary's judgments regarding the suitability of mine-specific safety plans are entitled to deference under the Mine Act, and reject the further claims of error.

**I.**

The Mine Act charges two separate agencies with complementary policymaking and adjudicative functions.[2] The Secretary, acting through MSHA, sets regulatory standards of mine safety, conducts regular mine inspections, and issues citations and orders in response to violations. 29 U.S.C. § 557a; 30 U.S.C. §§ 813, 814; *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 202-04 & n.5 (1994). The Commission, an adjudicatory body established as independent of the Secretary, reviews challenges to MSHA's actions. 30 U.S.C. §§ 815(d), 823. The Mine Act's split-function approach contrasts with the more typical administrative structure, in which rulemaking and adjudication are performed within a single agency. *See generally Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 151 (1991) (describing the analogous, split-function scheme under the Occupational Safety and Health Act (OSH Act)); 2 Charles H. Koch, Jr. & Richard Murphy, Administrative Law & Practice § 5:29 (3d ed.). The extra institutional separation the Mine Act provides reflects Congress's concern that the

---

[2] Pub. L. No. 95-164, 91 Stat. 1290 (1977), codified as amended at 30 U.S.C. § 801 *et seq.* The Mine Act amended the Federal Coal Mine Health and Safety Act of 1969 (the Coal Act), Pub. L. No. 91-173, 83 Stat. 742 (1969), by extending the coverage of the existing regulatory regime to non-coal mines and strengthening its protections of miners. *See United Mine Workers of Am., Int'l Union v. Dole*, 870 F.2d 662, 666 n.5 (D.C. Cir. 1989); S. Rep. No. 95-181, at 9 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3401, 3409.

adjudicatory function be institutionally independent of potential influence by the agency responsible for policymaking and enforcement decisions. *See* S. Rep. No. 95-181, at 47 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3401, 3447 ("[A]n independent Commission is essential to provide administrative adjudication which preserves due process and instills much more confidence in the program.").

The Mine Act requires the Secretary, acting through an MSHA district manager assigned to one of the nation's twelve mining districts, to negotiate mine-specific roof-support and ventilation plans with representatives of the companies that operate the mines. Congress decided that "individually tailored plans, with a nucleus of commonly accepted practices, are the best method of regulating such complex and potentially multifaceted problems as ventilation, roof control and the like." *Dole*, 870 F.2d at 669 n.10 (quoting S. Rep. No. 95-181 at 25, 1977 U.S.C.C.A.N. at 3425). As outlined below, the operators propose plans for the Secretary's consideration that they believe are "suitable" to ensure adequate roof support and ventilation based on each mine's unique geology and proposed mining system. 30 U.S.C. §§ 862(a), 863(*o*); *see Mach Mining, LLC v. Sec'y of Labor*, 728 F.3d 643, 649 (7th Cir. 2013). No mine may operate without an approved plan, and once the Secretary has approved a plan, its terms are enforceable as if they were duly promulgated regulations. 30 C.F.R. §§ 75.220(c), 75.370(d); *see Dole*, 870 F.2d at 667 & n.7; *Zeigler Coal Co. v. Kleppe*, 536 F.2d 398, 409 (D.C. Cir. 1976) (interpreting the predecessor Coal Act).

The first step in the process of plan approval is for a mine operator to develop roof-support and ventilation plans it thinks are suitable, and to submit the plans to the district manager for his or her consideration. 30 C.F.R. §§ 75.220(a),

75.370(a); *see* 30 U.S.C. §§ 862(a), 863(*o*); *Dole*, 870 F.2d at 668-69 & n.10. The operator must also provide proposed plans to the mine workers' representative prior to submitting them to the district manager, so that the representative may make comments for the district manager's consideration. 30 C.F.R. § 75.370(a)(3), (b). The district manager evaluates the operator's proposed plans (and miners' comments) in accordance with the Secretary's policy judgment, and in light of information about the prospective site and the agency's accumulated knowledge and experience. *See* 30 U.S.C. §§ 862(a), 863(*o*); 30 C.F.R. §§ 75.220(a), 75.370(a); S. Rep. No. 95-181 at 25, 1977 U.S.C.C.A.N. at 3425. If the district manager deems an operator's proposed plan insufficient to ensure miners' health and safety, he or she denies approval, explaining relevant concerns to the operator and giving the operator a chance to address the identified deficiencies. 30 C.F.R. §§ 75.220(b), 75.370(c). The operator and the district manager then engage in a good-faith negotiation in an effort to formulate a plan with which they both are satisfied. *Id.* §§ 75.220(a), 75.370(a), (c)(2); *see Sec'y of Labor v. Carbon Cnty. Coal Co.*, 7 FMSHRC 1367, 1371 (1985). The operator "ha[s] a role to play in developing plan contents, [but] [the Secretary] always retain[s] final responsibility for deciding what ha[s] to be included in the plan." *Dole*, 870 F.2d at 669 n.10; *see* 30 U.S.C. §§ 862(a), 863(*o*) (operators shall only adopt plans "approved by" the Secretary). In other words, "'while the operator proposes a plan and is entitled . . . to further consultation with the Secretary over revisions, the Secretary must independently exercise his judgment with respect to the content of such plans in connection with his final approval of the plan.'" *Dole*, 870 F.2d at 669 n.10 (quoting S. Rep. No. 95-181 at 25, 1977 U.S.C.C.A.N. at 3425). If a mine operates without an approved, mine-specific plan, the Secretary may issue citations, orders to withdraw

from the mine, civil fines, and criminal penalties. 30 U.S.C. §§ 814(a), (d), 815, 820.

The independent Commission is the administrative adjudicator under the Mine Act. 30 U.S.C. §§ 815, 823. A mine operator may appeal a citation issued by the Secretary to an administrative law judge, who conducts a hearing on behalf of the Commission in accordance with the Administrative Procedure Act. *Id.* §§ 815(d), 823(d)(1). At the hearing, the Secretary must support its citation by a preponderance of evidence in the record. *See* 5 U.S.C. §§ 554(c)(2), 556(d); *Steadman v. SEC*, 450 U.S. 91, 102 (1981) (interpreting "substantial evidence" under APA Section 556 to mean a preponderance of evidence). Based on the hearing and any related briefing, the ALJ makes findings of fact and either affirms, modifies, or vacates the Secretary's decisions. 30 U.S.C. §§ 815(d), 823(d)(1). A mine operator may petition the Commission for discretionary review of an ALJ's order. *Id.* § 823(a), (d)(2)(A). The Commission sits in Washington, D.C., and is comprised of five members, each appointed by the President with the advice and consent of the Senate, to a tenure-protected, six-year term. *Id*. § 823(a), (b). If the Commission denies review, the ALJ's decision becomes final. *Id.* § 823(d)(1). A person affected by a Commission decision has a right to review in this court or the court of appeals for the circuit in which the alleged violation occurred.[3] *Id.* § 816(a)(1).

---

[3] By contrast, anyone affected by the promulgation of a generally applicable rule may directly petition the Courts of Appeals for review; in those cases, the Mine Act does not call for administrative review by the Commission (or its ALJs). 30 U.S.C. § 811(d). The Secretary's exercise of his general rulemaking authority is subject to deferential judicial review. *Dole*, 870 F.2d at 666-67.

An operator may only commence mining under a plan the Secretary has approved, through a district manager, as "suitable." 30 U.S.C. §§ 862(a), 863(*o*); 30 C.F.R. §§ 75.220, 75.370. Sometimes, as in this case, an operator and district manager fail to reach agreement on suitable plan terms. The statute does not explicitly provide for administrative and judicial review of a district manager's refusal to accept the operator's proposed plan terms as suitable, but the Secretary and operators have developed a "technical citation" practice in order to enable review. *See Mach Mining*, 728 F.3d at 651-54. An operator that wishes to challenge a district manager's suitability decision momentarily commences operations under its preferred terms, without the requisite approval by the Secretary, prompting the Secretary to issue a technical citation that carries a nominal monetary penalty. *Id*. at 655-56. The operator then appeals the technical citation to the Commission and, as appropriate, a federal court of appeals. The technical citation process is described in the Secretary's policy manual. MSHA, Program Policy Manual Vol. V (Dec. 2013, Release V-48), at 5.[4]

## II.

In 2008, Prairie State proposed to construct an underground coal mine at the Lively Grove site in southern Illinois. At Lively Grove, Prairie State prepared to use large, remote-controlled, continuous mining machines that take cuts into the coal seam, convey the cut coal back to be carted out

---

[4] A 2006 amendment to the Mine Act codified the technical citation route to obtaining review in the face of disagreement over mine-specific accident response plans, 30 U.S.C. § 876(b)(2)(G), but not with respect to disagreements regarding the suitability of roof-support and ventilation plans, *see Mach Mining*, 728 F.3d at 655. The validity of the technical citation process is not at issue here.

of the mine, and—once they have tunneled into the seam to a target depth—withdraw from the coal face so that miners can use roofbolts or other supports to secure the roof above where the coal was removed. Prairie State proposed to make 40-foot deep cuts into the seam, and to create openings 20 feet across and, at tunnel intersections, 68 feet in diagonal span. For ventilation, Prairie State proposed to use a "fishtail" ventilation system, which circulates fresh air into the mine and splits the air stream, ensuring fresher air to more mine areas than a single stream that travels further and, it claims, can carry contaminants within the mine. Prairie State's position was that, with the fishtail system, ventilating 9,000 to 12,000 cubic feet per minute of air would suffice, depending on the number of open crosscuts.

Area geology around Lively Grove was known to the Secretary to present risks of roof falls and hazardous methane emissions. The district manager and his staff reviewed Prairie State's submissions in this case, determined that Prairie State's proposed plans were inadequate, and communicated their concerns to Prairie State along with suggested plan revisions. Over the ensuing year, Prairie State and the district manager traded written correspondence and engaged in more than thirty discussions regarding plan terms. They failed to reach agreement, however, on the issues of maximum permissible cut depth, tunnel entry width, diagonal span of tunnel intersections, and the adequacy of the ventilation system Prairie State proposed in the mine. The district manager declined to approve, at least at the outset in the absence of mining history at the site, cuts deeper than 20 feet, tunnel entries wider than 18 feet, and intersection diagonals longer than 64 feet. With respect to air quantities, the district manager called for ventilation of 20,000 to 25,000 cubic feet per minute—more than twice Prairie State's proposed volume. In light of the district manager's disapproval of

Prairie State's proposed terms, Prairie State triggered technical citations regarding roof-support and ventilation plans, which it challenged before the Commission.

The Commission assigned the citation challenges to an ALJ to conduct a hearing. The ALJ heard testimony on the merits of Prairie State's claims. The district manager, along with the roof-support and ventilation specialists working under his supervision, testified on the Secretary's behalf. Prairie State's representatives and expert witnesses also testified. With the benefit of post-hearing briefing, the ALJ affirmed both citations in a written opinion. The ALJ made factual findings describing the plan proposal, evaluation, negotiation, and plan-suitability determinations at Lively Grove.

The ALJ sustained the Secretary's determination that Prairie State's proposed plans were unsuitable. Over Prairie State's objection, the ALJ held as a matter of law that plan suitability is appropriately assessed "in terms of the discretion of the district manager" under a "standard of review [that] incorporates an element of reasonableness." 32 FMSHRC 602, 608 (May 2010). The ALJ then rejected Prairie State's assertion that the district manager's discretion was impermissibly constrained by a Procedure Instruction Letter that the Secretary had issued outlining procedures for evaluating operators' requests for extended cuts. The ALJ also excluded evidence about plans at other mines that Prairie State sought to introduce at the hearing on the ground that Prairie State had not submitted that evidence to the Secretary during plan negotiations.

The Commission granted Prairie State's petition for discretionary review and affirmed the ALJ on most issues. The Commission agreed with the ALJ's determination that the

citations were subject to arbitrary-and-capricious review by the Commission and its ALJs because that standard "appropriately respects the Secretary's judgment while allowing review for abuse of discretion, errors of law, and review of the record under the substantial evidence test." 35 FMSHRC 1985, 1990, 2013 WL 3947974 (July 2013) (internal quotation marks omitted). Deference is warranted in this context, the Commission reasoned, because ALJs and Commissioners "are not always best-equipped to decide technical issues regarding ventilation and roof control," and "are instead charged with deciding whether the district manager has made a fair and informed suitability determination." *Id.* at 1989 n.6. One Commissioner dissented, stating that Commission precedent "ha[d] long held that the Secretary bears the burden of establishing that the operator's plan . . . was *un*suitable," and that the ALJ had "short-circuited the [review] process by avoiding the threshold question of unsuitability," "effectively replac[ing] the burden of proof with a deferential 'review' of the rationality of the District Manager's negotiating position." *Id.* at 1998-99 (Young, Comm'r, dissenting).

The Commission affirmed the ALJ's rulings regarding evidentiary exclusions, reliance on the Procedure Instruction Letter, and the merits of Prairie State's challenges regarding cut depth, entry width, and diagonals. The Commission ordered a limited remand for the ALJ to explain her conclusion regarding ventilation. On remand, the ALJ provided further reasoning regarding the ventilation plan issue, and assessed a $200 penalty for Prairie State's two technical citations. Prairie State again appealed to the Commission, which denied further review. Prairie State then timely petitioned this court.

## III.

We review the legal determinations of the Commission and its ALJs *de novo* and factual findings for substantial evidentiary support. 30 U.S.C. § 816(a)(1); *Black Beauty Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 703 F.3d 553, 558 (D.C. Cir. 2012); *Sec'y of Labor v. Keystone Coal Mining Corp.*, 151 F.3d 1096, 1099 (D.C. Cir. 1998). We review evidentiary rulings for abuse of discretion, *Mach Mining*, 728 F.3d at 659; *cf. Veritas Health Servs., Inc. v. NLRB*, 671 F.3d 1267, 1273 (D.C. Cir. 2012), and accord "great deference" to the ALJ's credibility determinations, *Keystone Coal*, 151 F.3d at 1107.

## A.

The threshold question in this case concerns the standard under which the Commission and its ALJs review the Secretary's plan-suitability determinations in the context of a challenge to a technical citation. We may assume, without deciding, that *Chevron* governs our consideration of that question, as Prairie State failed to contest the Secretary's assertion that it does.[5] Because the Mine Act itself does not provide a definitive answer, *see* 30 U.S.C. § 815(d), we

---

[5] *But see Steadman*, 450 U.S. at 95 ("Where Congress has not prescribed the degree of proof which must be adduced by the proponent of a rule or order to carry its burden of persuasion in an administrative proceeding, this Court has felt at liberty to prescribe the standard, for it is the kind of question which has traditionally been left to the judiciary to resolve.") (internal quotation marks & alteration marks omitted); *Mach Mining*, 728 F.3d at 647 (sustaining without *Chevron* deference the Commission's decision to apply a deferential standard of review to the Secretary's approval of mine-specific plan-suitability determinations, citing *Steadman*).

consider it under *Chevron*'s second step, deferring to the Commission's reasonable interpretation of the Act, *see Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

The Commission has chosen to review the Secretary's plan determinations deferentially, and the Mine Act allows that choice. It is well established that the Commission and the courts owe deference to the Secretary's interpretation of the Mine Act and generally-applicable regulations promulgated thereunder. *See, e.g.*, *Akzo Nobel Salt, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 212 F.3d 1301, 1303 (D.C. Cir. 2000); *Sec'y of Labor v. Cannelton Indus., Inc.*, 867 F.2d 1432, 1435 (D.C. Cir. 1989); *see generally* 2 Koch & Murphy, Administrative Law & Practice § 5:29. The plans at issue here are sufficiently analogous to render reasonable the Commission's approach.

The Commission treats mine-specific safety plans as, in effect, contextually specific, mini regulations, similarly entitled to deference. The Senate Report supports the analogy. In discussing the Act's requirement of mine-specific plans to govern certain safety issues, the Report stated that "[s]uch individually tailored plans, with a nucleus of commonly accepted practices, are the best method of regulating such complex and potentially multifaceted problems as ventilation, roof control and the like." S. Rep. No. 95-181, at 25, 1977 U.S.C.C.A.N. at 3425. Once the Secretary approves them, the provisions of a mine-specific plan are as binding as a generally-applicable, duly-promulgated rule. *Dole*, 870 F.2d at 667 & n.7; *Zeigler*, 536 F.2d at 409. The Commission reasonably deemed the Secretary's determinations regarding roof support and ventilation as worthy of deference, given that they entail case-by-case judgments in the field based on unique geological

conditions and mining systems—judgments that the expert, policymaking agency is charged with and better equipped to make. *See id.*; 30 U.S.C. §§ 862(a), 863(*o*).

The statutory requirements of negotiation between the Secretary and an operator in the development of suitable, mine-specific plans, and the Mine Act's provision for miners' input during the plan-approval process, can be thought to play a role in the development of mine-specific plans akin to that of notice and comment in formal administrative rulemaking. Mine operators receive written notice of the reasoning and bases for the Secretary's initial plan-suitability determinations and have multiple opportunities to respond with arguments and supplemental data. *Carbon County*, 7 FMSHRC at 1370-71; 30 C.F.R. §§ 75.220, 75.370. Plan negotiations thus may reasonably be characterized as serving the same interests as notice and comment, albeit less formally: notice to affected parties, opportunities for such parties to develop the record by submitting factual and legal support, and improvement of the agency's decisionmaking. *See, e.g.*, *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983). Prairie State objects that the Secretary has effectively imposed rules without the protection of notice and comment, but the Commission reasonably treated the plan-negotiation process as giving operators adequate opportunity to frame the issues, have their views heard, and persuade the agency to make salutary changes.

The Supreme Court's treatment of the split-function structure created by the OSH Act, which closely parallels the Mine Act, also supports that analysis. *See Martin*, 499 U.S. at 152-55. The OSH Act's "administrative and judicial review procedures . . . are nearly identical to those in the Mine Act," which is "hardly surprising since . . . the Mine Act's review process was written to conform to the review process of the

OSH Act." *Sturm, Ruger & Co. v. Chao*, 300 F.3d 867, 872 (D.C. Cir. 2002) (internal quotation marks omitted). In *Martin*, the Supreme Court distinguished the split-function occupational health and safety regime from the typical, unitary agency that uses adjudication as a policymaking tool, emphasizing that the independent OSH Review Commission lacks delegated power to make law and policy. 499 U.S. at 154. The Court stated that "Congress intended to delegate to the Commission the type of nonpolicymaking adjudicatory powers typically exercised by a *court* in the agency-review context," and that, "[u]nder this conception of adjudication, the Commission is authorized to review the Secretary's interpretations only for consistency with the regulatory language and for reasonableness." *Id.* at 154-55.

Just as deference to the Secretary is warranted in the split-function administrative regime governing occupational health and safety, the institutional division and allocation of distinct functions under the Mine Act is fully consistent with limited, reasonableness review by the Commission of the Secretary's plan-suitability determinations. This court, following *Martin*, has recognized that the considered position of the Secretary in issuing a citation for violation of a generally-applicable mine safety regulation and defending it before the Commission is an exercise of delegated lawmaking power, and so entitled to deference. "The Secretary's interpretation before the Commission is 'agency action, not a *post hoc* rationalization of it.' And, 'when embodied in a citation, the Secretary's interpretation assumes a form expressly provided for by Congress,' and is therefore 'as much an exercise of delegated lawmaking powers as is the Secretary's promulgation of' a regulation." *Akzo Nobel Salt*, 212 F.3d at 1304 (quoting *Martin*, 499 U.S. at 157).

The Seventh Circuit, the only other federal court of appeals to have decided this issue, held that the process the Mine Act put in place for developing mine-specific plans is incompatible with *de novo* review of such plans by the Commission:

> [T]he process of approving a ventilation plan proposed by the mine operator . . . involves the *formulation* of a standard, not the *enforcement* of a standard. It requires the gathering of information by the mine operator and its presentation to the district manager, the manager's examining and assessing that material and considering the views of the operator on the appropriateness of the plan. At bottom, it entails the exercise of the Secretary's independent judgment as to the appropriateness of the plan to ensure the health and safety of the miners. There is, in other words, a congressional mandate that the Secretary exercise independent judgment that the plan safeguards those whom it is designed to protect. . . . [T]he Secretary's role of approving the plan is not really an enforcement role susceptible to de novo review, but rather a role imbued with a legislative or policy-making dimension to ensure that the plan is reflective of the public interest in mine safety.

*Mach Mining*, 728 F.3d at 657. In short, the process of developing mine-specific plans requires the Secretary, through the district manager, to engage in detail with mine operators and bring to bear expertise and experience. Whether the Act thus requires the Commission's deferential review, as *Mach Mining* held, or at least permits it, as we conclude, deferential review appropriately respects the Secretary's policymaking prerogative and ensures that his determinations are reasonable and adequately supported by

the evidence. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. Ruckelshaus*, 719 F.2d 1159, 1164 (D.C. Cir. 1983).

We reject Prairie State's argument that the Mine Act's incorporation of APA procedures necessarily puts the onus on the Secretary to prove to the Commission *de novo* the unsuitability of Prairie State's preferred, mine-specific safety plans. Prairie State conflates the burden of proof with the standard of review. The statute requires the Secretary to prove, by a preponderance of evidence, the bases of citations it issues. 30 U.S.C. § 815(d); 5 U.S.C. §§ 554(c)(2), 556(d); *see Steadman*, 450 U.S. at 102. In this case, the "order" of which the Secretary is a "proponent," 5 U.S.C. § 556(d), is the technical citation, and the basis of that citation is that the operator mined without an approved, suitable plan, *see* 30 U.S.C. § 814(a); 30 C.F.R. §§ 75.220(c), 75.370(d). That fact is not disputed here; the parties stipulated as much in order to trigger review.

It does not follow from the Secretary's burden under the APA to establish the grounds of a citation that the Commission must review *de novo* the Secretary's underlying suitability determination. Consistent with the statute, the Commission has held that the Secretary's burden is to persuade the Commission that the district manager did not abuse his discretion or act arbitrarily and capriciously in making his suitability determination, for instance by failing to examine relevant facts and draw reasonable conclusions. *See, e.g.*, *Sec'y of Labor v. Mach Mining, LLC*, 34 FMSHRC 1784, 1790 & n.13 (Aug. 2012). As discussed below, the Commission correctly held the Secretary to that standard in this case. 35 FMSHRC at 1989-90; *see infra* Section III-B. We accept the Commission's approach as a permissible reading of the Mine Act.

18

Prairie State relies on our decision in *Zeigler* for the proposition that, in reviewing a technical citation for operating without an approved safety plan, the Commission must presume the suitability of Prairie State's preferred plan, and so require the Secretary to establish its unsuitability. *Zeigler* held that mine-specific plan requirements are enforceable on the same terms as generally-applicable regulatory standards. 536 F.2d at 409. Prairie State draws from *Zeigler*'s observation that a ventilation plan "is not formulated by the Secretary, but is 'adopted by the operator,'" *id.* at 406, a presumptive legal primacy for the operator's plan: It is, in Prairie State's view, "[i]nherent in the *Zeigler* holding is that it is the operator's proposal that is being evaluated, not the Secretary's," and thus the district manager may impose no different requirements until the operator's plan has been proved to be *un*suitable, Petitioner Br. 22. But that language in *Zeigler* aimed primarily at quelling operators' concerns that regulation through mine-specific plans might lead to "mine inspectors run riot," using such plans as a means to evade the process for promulgating general rules on issues properly subject to general rulemaking by instead "simply insisting that newly formulated standards be included in one or another of the plans each operator must adopt." 536 F.2d at 406. No such end-run around the Mine Act's general rulemaking is claimed here. Moreover, *Zeigler* recognizes, as do we, both the regulatory character of mine-specific plans, and the Secretary's paramount control over and responsibility for mine-specific plans, which "must also be approved by the Secretary." *Id.*; *see also Dole*, 870 F.2d at 669 n.10 (although the operator "ha[s] a role to play in developing plan contents, [the Secretary] always retain[s] final responsibility for deciding what ha[s] to be included in the plan").

The nub of the parties' dispute is whether the Commission reasonably concluded that it owes deference to

the Secretary's action in this kind of case, involving a challenge to a technical citation on the ground that the district manager unlawfully eschewed Prairie State's preferred terms. The question is whether judgments about suitable roof support and ventilation in a particular underground mine—made by the specialized, on-the-ground official of the agency that Congress vested with policymaking authority over mine safety decisions—are entitled to deference, or whether a national administrative adjudicator independent of that agency should exercise its judgment on those issues afresh, without giving any special weight to the policymaking agency's determinations. Given that suitability is a discretionary, contextual exercise of expert judgment regarding the safeguards needed to keep miners safe, established principles of administrative law support the Commission's deference to the Secretary here. *See, e.g.*, *Martin*, 499 U.S. at 154-56.

We therefore hold that the standard of review applied by the Commission was at least a permissible one.

**B.**

Prairie State further contends that, even under deferential review, the Commission reversibly erred in sustaining the district manager's decisions regarding cut depth, entry widths, diagonals, and ventilation. We disagree.

**1.**

Prairie State asserts that the Commission's ALJ incorrectly refused to consider evidence Prairie State proffered about plans approved for other mines—information that it concededly had not submitted or cited to the district manager during the plan-development process. Prairie State contends that the ALJ incorrectly "limited the evidence that the District Manager should have considered to the specific

mine rather tha[n] what was readily available to him." Petitioner Br. 34. It asserts that consideration of practices at other mines was necessary both to comport with the plan-approval process and to be fair to operators who seek approval at new mines of practices already approved elsewhere.

We note that, at least ordinarily, the information relevant to the Secretary's decision will be that which was before the agency during the plan-development process. *See, e.g.*, *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (the "focal point" in arbitrary-and-capricious review is "the administrative record already in existence"); *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012) (review is "limited to assessing the record that was actually before the agency"); *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996). There is no reason to believe that expecting operators ordinarily to bring probative information to the attention of the front-line agency decision maker would encourage them to engage in excessive, wasteful, and distracting tactics of bombarding the agency with immaterial information.

We need not decide, however, whether the ALJ abused her discretion by declining to consider information that Prairie State did not cite in the plan-development process, because Prairie State has failed to explain how admission of such evidence at the review hearing might have changed the ALJ's decision regarding the reasonableness of the Secretary's plan. *See, e.g.*, *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration."). Prairie State objects that the ALJ refused to consider "plans that were approved at other mines in District 8," as well as "studies

conducted in District 8 concerning the taking of 40-foot extended cuts." Petitioner Br. 34. Prairie State does not, however, establish the comparability and pertinence of those other mines and studies. We therefore lack a basis on which to conclude that the proffered evidence might have shown that the plan-suitability determinations at Lively Grove were arbitrary or impermissibly inconsistent with determinations at other mines. Thus, assuming *arguendo* the ALJ abused her discretion by concluding that Prairie State could not rely on materials it failed to reference during plan discussions, we cannot say that such error harmed Prairie State. *See PDK Labs.*, 362 F.3d at 799.

**2.**

Prairie State argues that the Commission erred by failing to reverse as arbitrary and capricious the Secretary's cut-depth determination, which it contends should have authorized extended, 40-foot cuts immediately upon the opening of the mine. In particular, Prairie State contends that the district manager failed to make a mine-specific cut-length determination, instead unlawfully treating the cut-length guidance expressed in the Secretary's internal Procedure Instruction Letter, No. I08-V-03 (eff. June 6, 2008), as an across-the-board, binding rule. That Letter defines as an "extended cut" any instance of continuing to dig into a working coal face more than twenty feet beyond the last row of permanent roof supports without stopping to place additional supports in the newly excavated area. J.A. 293. The Letter advises against approval of extended cuts until an operator has first begun mining with standard, 20-foot cuts, so that a new mine's roof-support and ventilation needs can be evaluated under actual operating conditions before extended cuts are considered. J.A. 293-98; *see Nat'l Mining Ass'n v. Sec'y of Labor*, 589 F.3d 1368, 1371-73 (11th Cir. 2009).

Prairie State argues that, by following the Letter, the district manager failed to give mine-specific consideration to the merits of its request immediately to begin mining at Lively Grove with 40-foot cuts.

The Commission appropriately concluded, based on the record, that the district manager fulfilled his obligation to make a mine-specific determination on maximum permissible cut length. The Letter was not an across-the-board, substantive requirement, but gave guidance for site-specific consideration of operators' requests for extended cuts. *See Nat'l Mining Ass'n*, 589 F.3d at 1370-72. The district manager testified that he understood the Letter as counseling him "to look at developing a 20-foot [cut]" rather than a 40-foot cut, J.A. 111, and that an operator "couldn't get 40-foot cuts without going through [the Letter's] evaluation process," J.A. 112. That directive is consistent with the statutory requirement that the Secretary's plan approvals be based on the conditions prevailing at particular mines. *See* 30 U.S.C. §§ 862(a), 863(*o*). Indeed, the thrust of the Letter is to ensure that operators and district managers have data from initial operating experience at a site to inform the decision about cut length appropriate to the mine. The Commission noted that the district manager considered evidence that the coal seam at Lively Grove was gassy and that starting with shorter cuts would allow better methane and dust control. 35 FMSHRC at 1991-92. It concluded that, in applying the Letter, the district manager reasonably exercised informed discretion in light of the information available about mine-specific circumstances before the mine opened. *Id*. at 1994-95. We agree that the record supports that conclusion.[6]

---

[6] *See, e.g.*, J.A. 105-06 (hearing testimony from roof support specialist, on whom the district manager relied, regarding the

Prairie State similarly contends that the Secretary impermissibly applied a binding, across-the-board norm in refusing to approve Prairie State's requested terms governing entry widths, diagonals, and ventilation. The district manager, in Prairie State's view, engaged in "rote application" of "District-wide rules," rather than tailoring the plan to the specific conditions prevailing at the mine. Petitioner Br. 41-42. Those contentions are not based on the Letter as such, as the relevant Letter guidance deals only with cut depth, but similarly assert that the district manager derogated from his statutory duty to make mine-specific suitability determinations. The record supports the Commission's conclusion, however, that the district manager exercised discretion based on substantial evidence of safety and health considerations at Lively Grove.[7]

---

practice of starting with 20-foot cuts: "[Y]ou're trying to make me sound like I'm implementing a rule or some sort of regulation. . . . I suppose if the mine wanted to address it in another fashion as to how they would best support that intersection and protect the miner operator in the making of that first cut, that we would certainly look at that."); J.A. 109 (district manager's testimony that he relied on the input of his specialists, *inter alia*, for information and analysis). Once the district manager observed the mine's initial, safe operation with 20-foot cuts, he proceeded to authorize the requested extended cuts.

[7] *See, e.g.*, J.A. 93 (roof support specialist's testimony that starting with 18-foot entry widths was reasonable based on prior experience, but no suggestion that he interpreted that starting point as required across the board); J.A. 112 (district manager's testimony that approving 18-foot entry width was his standard practice, but stating that his decisions were "based upon recommendations from" the specialists advising him, and never indicating he felt bound by any rule depriving him of discretion).

**3.**

Finally, Prairie State argues that the Commission erred in upholding the Secretary's plan-specific determinations regarding cut depth, entry width, diagonals, and ventilation on the ground that they were not supported by substantial evidence. We disagree. The Commission relied on testimony of the district manager and his technical team, as well as correspondence and other documentation concerning safety and health advantages of the plan terms the district manager deemed suitable regarding cut depth, entry width, and diagonals. *See* 35 FMSHRC at 1990-93; 32 FMSHRC at 604-10 (ALJ findings and determinations).[8] On limited remand, the ALJ similarly based her findings regarding ventilation on sufficient evidence in the record, and the Commission denied further review. 35 FMSHRC 3272, 3274-75 (Oct. 2013).[9]

Prairie State's other arguments that the Secretary's determinations were arbitrary and capricious or contrary to law all lack merit. The Secretary did not ignore, as Prairie State asserts, certain alleged safety advantages of extended cuts. Rather, as noted above, the agency determined, in reasoned fashion and based on substantial evidence, that

---

[8] *See, e.g.*, J.A. at 111 (district manager's conclusion that 20-foot cut depths, 18-foot entry widths, and 64-foot diagonals would be safer than Prairie State's proposed corresponding alternatives); J.A. 103 (roof support specialist's testimony that 20-foot cuts are safer).

[9] *See, e.g.*, J.A. at 84 (ventilation specialist's testimony that 40-foot cuts have different impact on ventilation and dust control than 20-foot cuts).

extended cuts were not the safer, prudent practice that should initially be implemented at the mine.[10]

* * *

We deny the petition for review.

*So ordered.*

---

[10] We note that three pages of Prairie State's opening brief appear to be taken, virtually verbatim and without adequate attribution, from Commissioner Young's dissent. *Compare* Petitioner Br. 24-27, *with* 35 FMSHRC at 2001-02 (Young, Comm'r, dissenting). This court strongly disapproves of copy-and-paste argument. Extended quotation without quotation marks or appropriate citation amounts to misrepresentation to the court, *see* MODEL RULES OF PROF'L CONDUCT R. 8.4(c), and disservices the client.